# EXHIBIT

# A

AO 93 (Rev. 11/13) Search and Seizure Warrant

**SEALED**
**BY COURT ORDER**

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| 6877 Elverton Drive, Oakland, California. | ) ) ) | 3=16-70183 |

**MEJ**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

6877 Elverton Drive, Oakland, California (more fully described in ATTACHMENT A, incorporated herein by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B, fully incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____3-2-16_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Maria-Elena James_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   2-17-16

City and state:    San Francisco, CA

_____
*Judge's signature*

Hon. Maria-Elena James, U.S. Magistrate Judge
*Printed name and title*

US-013337

## ATTACHMENT A

## <u>PREMISES TO BE SEARCHED</u>

The property residence located at 6877 Elverton Drive, Oakland, California.  The property appears to be a multi-story residential building, with tan exterior, grey tile roof, and wood colored garage door.  The numbers "6877" are affixed to the exterior of the building to the right of the garage door.  The search shall include all rooms and all other parts therein, as well as surrounding grounds, garages, storage rooms and outbuildings of any kind, attached or unattached, located on the premises relating to address stated above. (Photographs depicting the home are attached below.)





Attachment A
Special Agent James Hade

US-013338

## ATTACHMENT B

### ITEMS TO BE SEIZED

For the period January 1, 2006 through the present, all items and records which constitute evidence, fruits, or instrumentalities of violations of 26 U.S.C. §§ 7201 (attempting to evade the assessment of a tax or payment thereof), 7206(1) (willfully making and subscribing to a materially false return); 31 U.S.C. §§ 5314, 5322(a) (willful violation of foreign bank and financial account reporting requirements); and 18 U.S.C. §§ 371 (conspiracy to commit an offense or defraud the government), 1343, 1349 (wire fraud & wire fraud attempts/conspiracy), 1956(a)(1) (money laundering – financial transaction offense), including the items listed below.

As used in this Attachment, the terms "records," "documents," and "materials" include all of the items described herein, in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, electronic mail, and/or data security devices.

I.    **The Items to Be Seized are those items relating to the following individuals and entities:**

   A. KEN TAYLOR;

   B. YAVAIR TAYLOR;

   C. SHARON RINGGENBERG;

   D. CHRIS JANN;

   E. CLEARFOG INVESTMENTS, LLC;

   F. CLEARFOG TRADING, LLC;

   G. CENTERLINK, LLC;

   H. KREIGHTON DACSHEL, LLC;

   I. RAIGOLD;

   J. SUCCESS BULLION USA or SUCCESS BULLION, LLC

   K. SUCCESS UNIVERSE GROUP (Hong Kong);

   L. PRESTIGIOUS BUSINESS SOLUTIONS;

   M. CRAIG SCOTT and the SCOTT INVESTMENT GROUP;

   N. DARRYL MORRIS and QUANTUM INTERNATIONAL TRADING;

## ATTACHMENT B

### ITEMS TO BE SEIZED

O. TONI HARDSTONE and COMMERCIAL ESCROW SERVICES;

P. AMERICAN UNITED TITLE & ESCROW;

Q. NICOLETTE CAIN and ARI CAPITAL

R. JONATHAN RIVAS and DCDB GROUP;

S. HELVETIA INTERNATIONAL BANCORP;

T. ROBERT HART;

U. HOWARD NEAL;

V. BARBARA FIGARI and FIGARI LAW;

W. Entities with variations of the names above; and

X. Any other entities and individuals engaging in financial transactions with the individuals and entities listed above.

II. **The Items to Be Seized are more specifically identified as:**

A. All records, files, correspondence, or other items relating to stand by letters of credit (SBLC), proof of funds, platform trading, FOREX transactions, or other financial instruments.

B. All records, files, correspondence, or other items relating to National Futures Association (NFA), Commodity Futures Trading Commission (CFTC), Nevada Attorney General, or Federal Bureau of Investigation (FBI).

C. All records, files, correspondence, or other items relating to wires, deposits, and transfers involving any attorney trust account or Interest on Lawyer Trust Accounts (IOLTAs).

D. Equipment and records related to the preparation and transmission of SWIFT messages; including all related client listings, broker listings, notes and memoranda.  All correspondence related to the preparation and transmission of SWIFT messages, including; letters, notes, electronic mail, and facsimile.

E. Business records including; books and records used in the preparation of business and financial statements, income statements, profit and loss statements, balance sheets, trial balances, financial summaries, financial worksheets, general ledgers, general journals, sales ledgers, sales journals, accounts receivable reports, cash receipts journals, cash disbursement journals, check registers, purchase receipts, receipt books, payroll records, client listings,

US-013340

## ATTACHMENT B

### ITEMS TO BE SEIZED

broker listings, all of which would be used to determine the amount of income, expenses, deductions, net income, taxable income and the tax liability of the individuals and entities listed above.

F. All records, documents, files, or other items relating to the rental or leasing of office space, mail boxes, postal boxes, or storage facilities, including electronic or "cloud-based" storage.

G. All records related to business or personal expenses and investments, including; sales invoices, purchase invoices, sales receipts, credit card statements, cancelled checks, closing statements, notes, contracts, purchase agreements and loan documents.   All correspondence related to business or personal expenses and investments including; letters, notes, electronic mail, and facsimile.

H. Employee personnel records, including lists of employees and employee information such as Social Security Number, address, telephone number, electronic mail (e-mail) address, or other identifying information.  Any schedules or other records of payments made to employees by check or cash (currency).

I. Financial institution, brokerage company, and bank documents more particularly described as signature cards, applications, account statements, savings passbooks, cancelled checks and checks to cash, deposit slips, bank checks, check registers, cashier's checks, money orders, withdrawal slips, records disclosing the disposition of withdrawals, wire transfers and wire instructions, promissory notes, negotiable instruments, safe deposit box records and keys, storage unit records and keys, all of which relate to the amount of income, expenses, deductions, and the tax liability of the individuals and entities listed above.

J. Federal and state income and payroll tax returns, schedules, IRS forms, preparation instructions and schedules, worksheets, letters and notices to or from the Internal Revenue Service or Franchise Tax Board, tax-related documents, notes and correspondence.

K. Any and all documents related to the use of nominee names and accounts or the attempt to conceal assets and income.

L. All items indicative of contracts, family relationships, fiduciary, or financial relationships among any of the individuals and entities listed above, or their officers, employees, or contractors.

M. Records relating to the acquisition, disposal, ownership, and control of property or other assets by the above-listed individuals and entities.

ATTACHMENT B

**ITEMS TO BE SEIZED**

N.  Loan and line-of-credit records including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash, check, or money order), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files, and internal memoranda relative to these loans.

O.  Any indicia of use, ownership, possession, or control of items or records listed above to be sought or indicia of ownership or use of any specific location or equipment containing the above-listed items, including rental and/or lease records, computer logs, utility and telephone bills, and mail.

III.  **Computers and Electronic Evidence**

The items above also include records, documents, programs, applications or materials created, modified or stored in any form, including, but not limited to, electronic format or as computer data, and also include the following:

A.  Any computer equipment and storage device capable of being used to commit, further or store such computer data (to include, but not limited to, SWIFT messaging-related equipment, hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips, thumb drives, secure digital media used in phones and cameras, personal music devices, Smart Phones, PDAs, cellular telephones, tablet computer devices, and any other devices or similar items capable of storing electronic communications and/or data);

B.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

C.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

D.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

E.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

US-013342

## ATTACHMENT B

### ITEMS TO BE SEIZED

F.  Any written or computer communication relating to the items sought above, in printed or stored medium, such as E-Mail and Chat Logs whether in active files, deleted files or unallocated space on the hard drives, floppy drives, thumb drives, or any data storage media;

G.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

H.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

I.  Any "contextual data," that is, evidence of how a digital device has been used, what it has been used for and who has used it, including, but not limited to, file directories and file/folder structure data, message transmission records, and records of Internet activity (use of and log ins to emails, financial, or other web sites), and other user-provided data.

ATTACHMENT C

United States District Court for the Northern District of California

## *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

1.    In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

(December 10, 2010)

1

US-013344

ATTACHMENT C

5.      When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.      The time periods set forth in this protocol may be extended by court order for good cause.

8.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

(December 10, 2010)

US-013345

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

US-013346

AO 106 (Rev. 04/10) Application for a Search Warrant

**SEALED BY COURT ORDER**

## UNITED STATES DISTRICT COURT
for the
Northern District of California

**FILED**

**FEB 17 2016**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

6877 Elverton Drive, Oakland, California.

)
)
)
)
)
)

Case No.

**3 16-70183 MEJ**

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

6877 Elverton Drive, Oakland, California (more fully described in ATTACHMENT A, incorporated herein by reference),

located in the ____Northern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B, fully incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

26 U.S.C. §§ 7201 (attempting to evade tax assessment/payment), 7206(1) (willfully making & subscribing to a materially false return); 31 U.S.C. §§ 5314, 5322(a) (willful violation of foreign bank & financial acct. reporting req'ts); 18 U.S.C. §§ 371 (conspiracy), 1343, 1349 (wire fraud & wire fraud attempts/conspiracy), 1956 (a)(1) (money laundering)

The application is based on these facts:

SEE ATTACHED AFFIDAVIT AND ATTACHMENTS.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Approved as to form:

_Andrew S. Huang, AUSA_

_Applicant's signature_

James M. Hade, Special Agent, IRS-Criminal Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2-17-16

_Judge's signature_

City and state: San Francisco, CA

Hon. Maria-Elena James, U.S. Magistrate Judge
*Printed name and title*

US-013347

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, James M. Hade, being duly sworn, depose and state the following:

## I. INTRODUCTION

1. This affidavit is being made in support of an application for issuance of a search warrant to seize certain evidence as described in Attachment B, incorporated herein by reference, believed to be at the premises commonly known as

    **6877 Elverton Drive, Oakland, California** (the "Target Premises"),

    as more fully described in Attachment A, and incorporated herein by reference.

2. As explained more fully below, the evidence indicates that the Target Premises is the residence of and place of business for KENNETH ALAN TAYLOR ("TAYLOR"), who is believed to be a leader in a set of financial fraud schemes, sometimes known collectively as "Advance Fee," "Prime Bank," or "High Yield" investment schemes. These inter-related schemes fit generally into three patterns:

    a. "Trading platform" or "private placement" transactions, whereby investor victims pay fees to participate in private trading marketplaces for commodities, such as precious metals. They are promised out-sized returns and are, on occasion, provided financial statements of their purported "brokerage accounts" with the understanding that the principal in those accounts are not theirs, only the profits that they will supposedly reap.

    b. "Standby letter of credit" ("SBLC") transactions involve victims in need of collateral to obtain financing. They are promised, for a fee, an SBLC that they can use to burnish their creditworthiness and obtain the desired financing.

US-013348

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

c.  SWIFT messaging services are promised to create an air of legitimacy to the fraudulent banking products sold.  Victims are promised that a message will be sent via the SWIFT network, which is a real mechanism for legitimate bank-to-bank communications and transactions.  The SWIFT service is provided either as part of the fee for fraudulent financial instruments (e.g., an SBLC) or as a standalone service for a separate fee.

3.  Since at least 2004, Taylor has owned, managed, or been affiliated with various entities that purport to provide banking, commodities trading, and other financial services.  These entities, which include Clearfog Investments, LLC, Clearfog Trading, LLC, Raigold, Success Bullion, Centerlink, LLC, and Kreighton Dacshel, LLC, charge fees to unsuspecting customers in exchange for bogus financial products such as standby letters of credit, access to funding, commodities trading accounts, and bank messaging services (known as SWIFT messaging).

4.  Based upon the information contained in this affidavit, your affiant believes there is probable cause to believe that now located at these premises is evidence, fruits, and instrumentalities of criminal offenses against the United States, namely:

- **Title 26, United States Code, Section 7201,** Attempt to Evade or Defeat the Assessment of a Tax or the Payment Thereof;

- **Title 26, United States Code, Section 7206(1),** Fraud and False Statement with respect to tax matters;

- **Title 31, United States Code, Sections 5314 and 5322(a),** Willful Violation of Foreign Bank and Financial Account Reporting Requirements;

- **Title 18, United States Code, Sections 1343 and 1349,** Wire Fraud and Wire Fraud Attempts and Conspiracy;

US-013349

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

- **Title 18 U.S.C. Section 1956(a)(1),** Money Laundering – Financial Transaction Offense;
- **Title 18 U.S.C. Section 371,** Conspiracy to Commit Offenses or to Defraud the United States

5. The facts and information contained in this affidavit are based on my training and experience, my personal observations, my participation in the investigation described herein, my conversations with other law enforcement agents and witnesses involved in this investigation, and my review of records and evidence obtained during this investigation.  This affidavit is not intended to detail each and every fact and circumstance of the investigation or all information known to me and other investigators involved.  Rather, this affidavit sets forth facts sufficient to establish probable cause to obtain the search warrant requested.   Therefore, I have not included every fact known to me about the investigation.   However, no fact known to me that could potentially and materially mitigate a finding of probable cause has been excluded.

## II. PREVIOUS SEARCH WARRANTS

7. On June 21, 2011, the Honorable Donna M. Ryu, United States Magistrate Judge, issued three search warrants, in Case Nos. CR 11-90539-MISC, CR 11-90540-MISC, and CR 11-90541-MISC (collectively, the "Prior E-Mail Warrants"), for e-mail accounts relating to this investigation.  The applications submitted for the Prior E-Mail Warrants were all supported by the same Affidavit in Support of Search Warrants (the "E-Mail Affidavit") sworn to by FBI Special Agent Steven C. Coffin.  A copy of the E-Mail Affidavit is attached to this affidavit as Attachment D and incorporated herein by reference.

US-013350

Northern District of California
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

## III. AGENT BACKGROUND

8. I am a Special Agent of the United States Department of the Treasury, Internal Revenue Service – Criminal Investigation ("IRS-CI"), and have been so employed since September 2011. I am currently assigned to the Oakland Field Office. As an Internal Revenue Service ("IRS") Special Agent, my duties include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), Money Laundering Statutes (Title 18, United States Code), Bank Secrecy Statutes (Title 31, United States Code), and other related offenses.

9. My professional and academic training includes approximately six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia. This training included criminal investigative courses in law enforcement techniques, federal criminal statutes, conducting criminal investigations, and the execution of search warrants. This training included instruction on the Fourth Amendment of the United States as it pertains to lawful search and seizures.

10. In addition to the criminal investigative training, I completed a Special Agent Basic Training course, which included courses in financial investigative techniques, the investigation of income tax evasion schemes, legal principles, and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26, and 31.

11. I received a Bachelor's of Science in Business Administration, emphasis in Accounting and Finance, from California Polytechnic University San Luis Obispo in June 2004. I have several years of work experience in commercial banking and public accounting. I have been a licensed Certified Public Accountant in the state of California since July 2008. I am familiar with federal income tax laws and through my work experience I have prepared and reviewed numerous business

US-013351

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

and individual income tax returns.  I am familiar with the record keeping and taxation of these entities.

12. I know the United States asserts jurisdiction to tax foreign corporations if they are engaged in business in the United States or receive income from sources within the United States.  The use of foreign corporations created in tax haven countries continues to be a common ploy used by individuals to evade taxes.  The control of foreign corporations allows individuals to place income and assets in countries from which it is difficult to obtain evidence.  A tax haven, by definition, is a country that has little or no income tax laws for U.S. citizens, strict bank secrecy laws, favorable incorporation and tax structure creation laws, and modern banking and communication facilities.  Many tax structures in tax haven countries are created to give the individual beneficial ownership of income or assets.  Beneficial ownership is the ability to control and enjoy the benefits of ownership, without appearing to own the asset itself.  Offshore tax evasion schemes typically involve the creation of structures that make it appear a foreign entity is the owner of assets and income, when in fact and substance, true ownership remains with a U.S. taxpayer. Taxpayers may utilize a variety of devices to conceal transfers of money or other property to a foreign entity.  The simplest method of diverting income is sending income to an offshore bank account or entity.

13. I know United States persons are required to file a Report of Foreign Bank and Financial Accounts ("FBAR") if the United States person had a financial interest in or signature authority over at least one financial account located outside of the United States, and the aggregate value of all foreign financial accounts exceeded $10,000 at any time during the calendar year.  A United States person includes U.S. citizens, U.S. residents, and entities, including corporations, partnerships, or

US-013352

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

limited liability companies, created or organized in the United States, or under the laws of the United States.

14. I know it is not necessary for an individual or entity to file an income tax return to willfully attempt to evade the assessment of tax in violation of Title 26, United States Code, Section 7201. The requirement of an attempt to evade is met by an affirmative act with a tax evasion motive. The Supreme Court set out the following examples of what can constitute an "affirmative willful attempt" to evade: Keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind and any conduct, the likely effect of which would be to mislead or to conceal. Failing to file a return, coupled with an affirmative act of evasion, has come to be known as a *Spies* evasion after *Spies v. United States, 317 U.S. 492* (1943).

15. I know individuals engaged in money laundering take steps to conceal or disguise the nature, locations, source, ownership, and control of the proceeds from an unlawful activity.   Many times money laundering involves moving substantial amounts of money into or out of the United States through foreign business entities and foreign bank accounts, as well as through various layers of business entities without a clear business purpose.

16. I am familiar with the methods and practices used by individuals and organizations engaged in money laundering and violations of the Internal Revenue Code. These individuals maintain records of their financial activities, such as bank records, receipts and documentation of expenditures, written notes and correspondence, negotiated instruments, contracts, and other financial

US-013353

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

documents.  Based on my training and experience, these records are commonly kept within their residence, at their office, or at other locations that are under their control.  Individuals often maintain these records on computers and other related equipment.

17. Based on my training and experience, including my review of e-mail accounts in other cases, and my conversations with other law enforcement officers, I know that the long-term retention of records in electronic form, including in e-mail accounts, can be even more extended than the retention of paper records.  Given the nature of electronic data, the use of computers and e-mail, the volume of e-mail and other electronically-generated documents, the increasingly larger (limitless, in many cases) storage capacity of digital media and e-mail accounts, and the relatively modest amount of physical space required, individuals using e-mail, computers, and other electronic devices tend to retain digital data for longer periods of time, spanning multiple years and even indefinitely.

18. Persons engaged in financial crimes often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over an extensive period.  Based on my experience and review of *United States v. Greany, 929 F.2d 523* (9th Cir. 1991), where there is a long-term or ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity has ceased (e.g., financial records), the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale.  There are many reasons why persons maintain evidence for long periods of time.  For example, the evidence may be necessary business records which must be kept for informational purposes, banking, account applications, loan applications, and to produce profit and loss statements and balance sheets.  The

US-013354

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

evidence may also be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials) but have significance and relevance when considered in light of other evidence.  The individual may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The individual may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, which in fact may be retrievable by a trained forensic computer expert.  Furthermore, the proceeds generated from both legal and illegal activities may be expended many years after the activity has stopped.  Thus, records reflecting income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

19. Based on my training and experience, discussions with knowledgeable law enforcement personnel, and my investigation in this case, I know the following:

    a. Business entities, such as investment firms, must engage the services of bookkeepers and accountants who use computers to maintain bookkeeping, accounting, and other financial records, frequently with specialized accounting software.  I also know that such records are usually maintained for several years because they are necessary for tax and other purposes.

    b. For any portion of financial or accounting information to be understood,

US-013355

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

contextual accounting and financial information, such as complete general ledgers, documentation of other sources of income and causes of expenses, may need to be seized, including records of activities preceding and following the suspected period of criminal activity.

c.  Individuals engaged in criminal activity as part of their regular business practices keep and maintain business records in their businesses and homes for long periods of time.  In this case, Taylor often and consistently used his home as his business address throughout the period of the fraud schemes, as described above.

d.  I also know from my training and experience that individuals involved in financial fraud often conceal in their residences caches of documents related to false/fraudulent transactions, currency, financial instruments, precious metals, jewelry, other items of value or proceeds of fraudulent activities, and evidence of financial transactions relating to the obtaining, transferring, concealment or spending of large sums of money derived from engaging in fraudulent activities.  These items are often stored in locked security containers or safety deposit boxes.  These items are often stored for long periods of time.

e.  Based upon my training and experience, I also know that individuals who engage in financial fraud often utilize personal residences to store letters, packages, records, documents, and computers used in the course of, and to further, their fraudulent schemes.  Very often, the letters, packages, records, documents, and computers stored at these locations contain evidence, fruits, contraband, or instrumentalities of crime.  Again, these items are often stored for long periods of time.

f.  Individuals who engage in financial fraud will often maintain financial

US-013356

records, co-conspirators' names, and other business records, all pertaining to the fraud and disposition of the proceeds of the fraud, in their residences and secure locations, and on personal computers.  In this case, witnesses and other evidence, such as e-mails, indicate that Taylor and his business associates used computers and/or other digital devices, to conduct business and fraudulent activities.

g.  Individuals who are involved in all of these activities often retain evidence of such activity on their computers or other forms of electronic storage media for long periods of time.

## IV. BACKGROUND ON COMPUTERS AND ELECTRONIC EVIDENCE

20. This application seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively, "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes.  Searches of digital devices and seizure of any data will comport with the protocol set forth in Attachment C, which is hereby incorporated by reference.

21. Based upon my conversations with other law enforcement personnel and in my experience and training, I know that computers and other electronic equipment, including cell phones and smart phones, are often used to facilitate and maintain records in complex financial crimes, particularly where, as here, there is evidence that the targets are creating the appearance of a legitimate business and availing themselves of Internet-based services.  Therefore, there is probable cause to believe that digital devices will be found at the locations to be searched and that those digital devices will contain evidence, fruits, and instrumentalities of the crimes described above.

US-013357

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

22. Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

23. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for businesses, including illegal ones, to utilize computers to conduct their business and to store information related thereto. I also know that it is common for individuals to have personal computers and to use these computers to conduct their personal affairs, their business affairs, and to store information related thereto.

24. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove

US-013358

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

digital devices or media for later laboratory evaluation off-site under controlled circumstances.  This is true for a number of reasons, including the following:

   a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

   b.  Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence.  The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

   c.  The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  Storage devices capable of storing 500 gigabytes of data are now common in desktop computers.  It can take several hours, or even days, to image a single hard drive.  The larger the drive, the longer it takes.  Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

   d.  Because digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data.  Moreover, a

US-013359

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e.  Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used.  For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process.  The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted.  The relevance of this kind of data is often contextual.  Furthermore, many common e-mail, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

f.  Searching digital devices can require the use of precise, scientific

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

25. This warrant seeks authority to seize contextual data, that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

   a. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files

US-013361

### Northern District of California
### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

c. Further, evidence of how a digital device has been used, what it has been

US-013362

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

26. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth in Attachment C and incorporated by reference herein:

   a. Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

US-013363

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

b. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

d. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data;

US-013364

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

h.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that provide evidence of the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; e-mail addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; e-mail, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device);

i.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device; and

j.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## V. APPLICABLE STATUTES

27. This affidavit is made in support of an application for search warrant regarding the location described in Attachment A, and to search for and seize property that

US-013365

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

constitutes evidence of the commission of criminal offenses, the fruits of such crimes, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing the criminal offenses, as described in Attachment B, which constitute violations of law under the following statutes:

a. Attempt to Evade or Defeat Tax -- Title 26, United States Code, Section 7201, provides in relevant part, "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . ."

b. False Declaration Under Penalty of Perjury -- Title 26, United States Code, Section 7206(1), provides in relevant part, "Any person who . . . [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;. . . shall be guilty of a felony . . . ."

c. Willful Violation of Foreign Bank and Financial Account Reporting Requirement -- Title 31, United States Code, Sections 5314 and 5322(a), provide criminal penalties for the willful violations of requirements prescribed by the Secretary of the Treasury for persons in, and doing business in, the United States to keep records and/or file reports when making a transaction or maintaining a relation for any person with a foreign financial agency.

d. Wire Fraud -- Title 18, United States Code, Section 1343, provides in relevant part, "Whoever, having devised or intending to devise any scheme

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1    or artifice to defraud, or for obtaining money or property by means of false

2    or fraudulent pretenses, representations, or promises, transmits or causes

3    to be transmitted by means of wire, radio, or television communication in

4    interstate or foreign commerce, any writings, signs, signals, pictures, or

5    sounds for the purpose of executing such scheme or artifice, shall be fined

6    under this title or imprisoned not more than 20 years, or both." (Title 18,

7    United States Code, Section 1349 makes those who attempt and/or

8    conspire to violate Section 1343 subject to the same penalties.)

9    e.   Money Laundering Financial Transaction Offense -- Title 18 U.S.C.

10   Section 1956(a)(1), provides, in part, that a person "knowing that the

11   property involved in a financial transaction represents the proceeds of

12   some form of unlawful activity, conducts or attempts to conduct such a

13   financial transaction, which in fact involves the proceeds of specified

14   unlawful activity . . . . knowing that the transaction is designed to conceal or

15   disguise the nature, the location, the source, the ownership, or the control

16   of the proceeds of specified unlawful activity; . . . shall be [criminally liable].

17   f.   Conspiracy -- Title 18 U.S.C. Section 371 provides in relevant part, "If two

18   or more persons conspire either to commit any offense against the United

19   States, or to defraud the United States, or any agency thereof in any

20   manner or for any purpose, and one or more of such persons do any act to

21   effect the object of the conspiracy, each shall be fined under this title or

22   imprisoned not more than five years, or both."

### VI. FACTS ESTABLISHING PROBABLE CAUSE

28. The E-Mail Affidavit (Attachment D) incorporated herein was sworn to on June 21,

2011. The facts summarized here supplement and update the facts contained in

US-013367

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

the E-Mail Affidavit.

### A.    Background on Kenneth Taylor and Subject Entities

29. Kenneth Alan Taylor ("Taylor") has participated in the operation of several investment schemes where he uses attorneys, multiple business entities and bank accounts, both foreign and domestic, to conceal the illicit proceeds.   Taylor is not a licensed securities broker.

30. Taylor is affiliated with Success Bullion USA ("SBUSA") and its predecessor Raigold Financial Services Group ("Raigold"), which are described with detail in the E-Mail Affidavit.  Taylor provided significant funding for the operations of SBUSA and Raigold, as described below.

31. Taylor is the sole member and President, of Clearfog Investments LLC.  The organizational documents for the entity were filed with the State of California on August 17, 2004.  The filing documents were executed by Taylor and state the entity will be managed by one member.

32. For Tax Years 2007 to 2010, Taylor and Angela Taylor, who is identified on tax forms as Taylor's spouse, filed a Schedule C (*Profit or Loss from Business*) for Clearfog Investments LLC as part of their Forms 1040 (*U.S. Individual Income Tax Return*).  On the Schedule C filings, Clearfog Investments' principal business or profession is described as "Investment Management."

33. Taylor is also the sole member of Clearfog Trading LLC.  The organizational documents for Clearfog Trading LLC were filed with the State of California on January 24, 2006.  The filing documents were executed by Taylor, and state the entity will be managed by one member.  In his own written correspondence, Taylor's signature line reads Ken Taylor, Clearfog Trading.  In a conversation with a representative of the National Futures Association ("NFA"), Taylor described himself as controlling both Clearfog Investments LLC and Clearfog Trading.

US-013368

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

34. Taylor is associated with Centerlink LLC.  The organizational documents for Centerlink LLC were filed with the State of California on September 17, 2010.  On the California Secretary of State's website, the jurisdiction listed for Centerlink LLC is "Other State," meaning the entity was originally created outside of California.  The entity's address is listed as Hunkins Waterfront Plaza, Main St., Charlestown, Nevis, West Indies.

35. Internet research revealed the island of Nevis, where Centerlink LLC was created, is part of the St. Kitts and Nevis Federation, a well-known tax haven.  Nevis provides services such as incorporation of offshore companies, the formation of offshore limited liability companies ("LLCs"), and offshore banking.

36. The tax haven of Nevis imposes no local taxes on the income earned by Nevis based companies.  Offshore companies that conduct business outside of Nevis are not subject to income tax on the island.  Offshore companies are not subject to any of the following forms of taxation by Nevis: income tax, withholding tax, capital gains tax, estate tax, inheritance tax, or gift tax.

37. When offshore entities are created in Nevis, the names and information of the beneficial owners are not filed as public information.

38. An LLC formed in Nevis pays no taxes in Nevis.  Income or assets derived outside of Nevis are not subject to any form of local taxation.  Nevis offshore limited liability companies pay no taxes on dividends, interest, or disbursement of wages.

39. JP Morgan Chase bank's customer information lists Centerlink LLC's address as the Target Premises.  JP Morgan Chase bank customer information also lists "Taylor" as a "Signer" on Centerlink LLC's account.

40. Taylor owns and controls Kreighton Dacshel LLC.  The organizational documents for Kreighton Dacshel LLC were filed with the State of California on June 19, 2012.  The entity's address on the organizational documents is the Target

US-013369

Northern District of California
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

Premises.

41. On a Limited Liability Company Resolution to Open Accounts form with First Bank of the Republic dated August 28, 2012, Taylor signs as the Managing Member of Kreighton Dacshel LLC.

42. In several Master Signature Card and Agreements to Open Account(s) forms with First Republic Bank, Taylor describes his employer as Kreighton Dacshel LLC, and lists his occupation as "CEO, Private Sector Executive."

**B.    Background on Success Bullion USA ("SBUSA")**

43. The E-Mail Affidavit, particularly at paragraphs 14 to 25, 43 to 45, and 53 to 64, describes SBUSA and its predecessor, Raigold.  The facts summarized in that affidavit indicate that both SBUSA and Raigold were sham companies, with SBUSA maintaining an appearance of legitimacy through its falsely claimed ties to a Chinese parent company.

44. The Commodity Futures Trading Commission ("CFTC") has also investigated SBUSA.  The CFTC took sworn testimony from Sharon Ringgenberg ("Ringgenberg"), a subject of this investigation, on August 28, 2012.  She told attorneys from the CFTC that she had the title of Vice President of Operations for SBUSA, but the company never became operational.  She said the owner of SBUSA was Chris Jann ("Jann"), a citizen of Taiwan, who was residing overseas. Ringgenberg said she did not create SBUSA's website, and she was unaware of whether SBUSA had any relationship to Success Universe in Hong Kong. Ringgenberg told the CFTC that she was unaware of SBUSA conducting trades for any clients.  Ringgenberg said Jann asked her to build a client base for SBUSA, but she never brought in a single client.  She told the CFTC she received no income from SBUSA.  Ringgenberg said she created numerous fictitious foreign exchange trading account statements for potential clients of SBUSA.

US-013370

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

These statements appeared to show active accounts at SBUSA, but they had no basis in reality. She told the CFTC they were merely intended to show potential clients what a statement for a trading account would look like. She acknowledged the documents she produced were not valid financial instruments. Neither she nor SBUSA could have produced valid financial instruments.

45. Ringgenberg further testified to the CFTC that she provided the fictitious documents to individuals who essentially acted as brokers trying to find clients for SBUSA. When CFTC attorneys questioned why Ringgenberg was paid tens of thousands of dollars by one of these unlicensed brokers for creating each of these examples – taking at most a few hours of her time – she said she did not know. She claimed it never crossed her mind to inquire why she was being paid so handsomely by the brokers. She simply and repeatedly testified that her compensation "was offered and I accepted it."

46. Ringgenberg's bank records were reviewed for 2009 through early 2011. Based on the records, it does not appear that she received salary or commissions directly from SBUSA. Instead, most of the payments to Ringgenberg seemed to come from unlicensed brokers such as Craig Scott ("Scott"), Daryl Morris ("Morris"), and others. In analyzing Ringgenberg's bank accounts, numerous payments were found from her unlicensed brokers or their representatives between 2009 and early 2011. These payments, sent primarily by wire, amounted to slightly more than $3 million. The name on the account into which most of the deposits were made was "SBUSA." Despite the account name, Ringgenberg testified to the CFTC that it was a personal, rather than business, account. She told the CFTC that she created and controlled this account.

47. The investigation has revealed Taylor made several payments from his Clearfog Investments LLC bank account to finance the operations of SBUSA. Taylor made

US-013371

payments to Jann for "Consulting," payments to Ringgenberg for "Admin Work," payments to Ringgenberg for "Consulting," and payments for "Office Rent (Raigold)."

48. Ringgenberg's bank records reveal that she transferred the proceeds of SBUSA transactions to Taylor, thereby indicating a business partnership.  Before Ringgenberg began to receive payments related to her role with SBUSA, she received $12,000 in total from Taylor's Clearfog Investments LLC bank account. After unlicensed brokers began paying Ringgenberg in 2009, Ringgenberg sent a wire and checks totaling $196,388 to Taylor and Clearfog Investments, LLC.

49. In 2010, Ringgenberg apparently made no payments directly to Taylor; however, she sent wires, checks, and made counter-deposits totaling $1,166,637 to the bank accounts of two attorneys who represented Taylor.  The attorney receiving most of the funds was Howard Neal, who is the registered agent for several of Taylor's companies, including Clearfog Investments LLC, Clearfog Trading LLC, and Centerlink LLC.  Bank records also show someone transferring funds from Ringgenberg's accounts into the attorney-client bank account of Barbara Figari. In the memo line of one of Ringgenberg's checks made payable to "Fagari (sic) Law," someone wrote "Ken Taylor."

50. Unlike Ringgenberg, Taylor did not openly purport to be an employee of SBUSA. However, evidence obtained during the investigation indicates Taylor had an active role in creating, promoting, and operating SBUSA. Jann, who was the licensed principal for SBUSA, informed the CFTC that Taylor assisted Jann in registering SBUSA with the NFA.  In addition, in an interview on June 24, 2015, Brandon Colker ("Colker"), a broker for SBUSA / Raigold, identified Taylor as the individual who recruited him to sell proof of funds on behalf of Raigold.  Taylor introduced Colker to the proof of funds concept.  Taylor told Colker Raigold had

over $500 million at its disposal.

51. In an interview on June 29, 2015, Colker's business partner and fellow broker, Chris Sanford ("Sanford"), described Taylor as his point of contact at Raigold. Taylor also provided SWIFT message services. Sanford described the language on the SWIFT messages as "like playing game," saying they could be manipulated to change their effectiveness. Sanford and Colker knew the limitations of the SWIFT messages from Taylor. Sanford believes Taylor knew the limitations as well. Sanford thinks the SWIFT messages were an attempt by Taylor and Raigold to deny accountability to victims.

52. Your affiant researched registered SWIFT users on the SWIFT organization's website. Your affiant discovered "Centerlink LLC" is registered as a SWIFT user. The address for Centerlink LLC is listed as Charlestown, Main Street, Saint Kitts and Nevis.

53. On May 13, 2011, Ringgenberg received an email from a third party bragging "Ken" wrote a new clause for (the) SBLC that puts clients in an impossible position. Given the context of the email, and the third party's relationship to Taylor, your affiant believes this email is referring to Ken Taylor.

**C.    The Proof of Funds and Platform Trading Schemes**

     **i.    Success Bullion USA ("SBUSA") and Raigold LLC**

54. The E-Mail Affidavit, particularly at paragraphs 26 to 37, summarizes facts relating to the POF or platform trading fraud, perpetuated under the entity SBUSA.

     **ii.    Clearfog Investments LLC and Clearfog Trading LLC**

55. On July 25, 2008, Kenya Gatabaki ("Gatabaki") emailed a complaint to the National Futures Association ("NFA") regarding Clearfog Investments LLC, Taylor, and Taylor's associates.

56. According to the complaint, in November 2006, Gatabaki executed a contract in

US-013373

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

which he wired $100,000 to Clearfog Investments LLC.  Per the contract, the $100,000 was to be leveraged into a substantial sum, from which Gatabaki was to receive a portion of the investment returns.  The contract reads, in part, "Gatabaki and Clearfog Investments shall each receive an amount equal to fifty percent (50%) of the total amount received from the Program as an initial distribution.  Said initial distribution may occur within two to three weeks from entry into the Program, and has historically been in the amount of Five Million USD ($5,000,000).  The Program has historically paid a return of fifty percent (50%) per month of the Leveraged Amount."  The contract was executed by Leon Andrews ("Andrews"), a former employee of Clearfog Investments LLC.

57. Gatabaki worked with an individual named Henry Cruz ("Cruz") who represented himself as Clearfog Investments LLC's in-house attorney.  A public records search of Cruz discovered he was disbarred in 2000, long before his dealings with Gatabaki.

58. In February 2007, Gatabaki grew concerned because he had not heard anything from Clearfog Investments LLC regarding his investment.  Gatabaki emailed Andrews regarding his concerns, and received an email dated February 2, 2007 from Taylor assuring Gatabaki his "deal was not being ignored."

59. The NFA contacted Taylor to obtain his response to Gatabaki's allegations of fraud.  Taylor responded he never entered into an agreement with Gatabaki, and never represented any guaranteed returns.  Taylor stated Andrews, a former employee of Clearfog Investments LLC, entered into the agreement with Gatabaki.  However, according to Gatabaki, he was solicited by Taylor directly via telephone calls and emails.

60. Despite several calls and voicemails, the NFA was never able to make contact with Andrews.

US-013374

## Northern District of California
## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

61. Two years after Gatabaki's $100,000 investment, he had still not received any investment returns, or the return of his principal.

      iii.    <u>Clearfog Trading LLC</u>

62. On May 27, 2009, the NFA received a complaint from Aunita Jones ("Jones") regarding Clearfog Trading LLC and Yavair Taylor. Your affiant and the FBI interviewed Jones regarding the complaint on February 26, 2015.

63. Jones was introduced to Clearfog Trading LLC by Yavair Taylor. Witnesses have stated Yavair Taylor is related to Ken Taylor.

64. Yavair Taylor visited Jones' residence and showed her marketing material for investing in foreign currency. Yavair Taylor promised significant investment returns to Jones. Jones made an investment of $10,000. The investment was through Clearfog Trading LLC into an account with Raigold.

65. For three months Jones was able to log into her account on Raigold's website, raigoldtrading.com, and review her account activity. Jones saw her investment supposedly increase by 30%. After a few weeks, she attempted to withdraw some of her gains. Although there was a button on the website to withdraw funds, she was unable to do so. Jones attempted to contact Yavair Taylor about the issue, but he never returned her calls.

66. The phone number provided by Yavair Taylor was answered by a female receptionist who always transferred Jones to another line. For several attempts, no one answered the other line. Jones finally reached someone identifying himself as Ken Taylor. Jones explained to Taylor she was having trouble withdrawing her money. Taylor told her he did not know what the problem is, it had never happened before, and something was wrong with the computer. After the phone call, Taylor did not contact Jones with any type of solution to her withdrawal issue.

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

67. Jones visited the address for Clearfog Trading LLC provided by Yavair Taylor. The address was 1990 N. California Blvd., 8th Floor, Walnut Creek, California. The office did not have any signage related to Clearfog Investments LLC or Clearfog Trading LLC. Jones spoke with the female receptionist, and the receptionist told her she did not know Yavair Taylor or Ken Taylor very well, she only met them a few times. The receptionist said she is paid to answer and transfer calls.

68. Jones visited the office several more times to inquire about her investment. On one occasion she spoke with Taylor in the lobby of the eighth floor. Taylor told Jones something was wrong, and "he's going to get it straightened out." Taylor said he was in charge and "you have my word." Again, Taylor never followed up with Jones to resolve the issue.

69. Several weeks after Jones met with Taylor, Jones attempted to log into her account at Raigold.com, but her account was gone. Approximately one year after she made her investment, Clearfog Trading LLC was gone as well. Jones attempted to call the phone number for Clearfog Trading LLC several more times, but the line was disconnected.

70. Jones hired a private investigator to assist her in finding Yavair and Ken Taylor, but with no success. Jones never received any of her investment back. Raigold no longer has a website. Based on an internet search, as of December 2, 2010, raigoldtrading.com was listed as a deleted or pending (to be) deleted domain name.

71. Jones identified Yavair Taylor and Ken Taylor from photo line-ups during her interview.

72. Jones was introduced to Yavair Taylor by her friend Jue Brown ("Brown"). Brown invested $3,000 with Yavair Taylor and, like Jones, never received any returns.

US-013376

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

Like Jones, Brown attempted to contact Yavair several times without success.

73. On January 20, 2015, your affiant visited 1990 N. California Blvd. in Walnut Creek, California, and saw no indication Clearfog Investments LLC or Clearfog Trading LLC were conducting business at the location.

74. In a letter to the NFA in response to Jones' complaint, Taylor wrote:

> Per our conversation earlier today, Clearfog Investments is not a hedge fund nor do we accept funds from anyone. The investments made by Clearfog Investments uses the funds made from Real Estate investments over the years. We have no desire to accept client funds now or in the future. Again, all the funds in the Clearfog Investments account at FXCM belong solely to Clearfog Investments and there are no other individuals or entities that have any part of the account whether financial or otherwise.

75. Based on my training and experience and consultation with others, I know:

a. Although an investment may lose part or all of its principal, account statements remain available to the investor;

b. The investor is still able to contact their investment advisor and discuss the performance of their investment;

c. An investor's account as well as their investment advisors becoming suddenly unavailable, is indicative of fraud; and

d. The promising of returns on investment dramatically above typical market rates, such as a 50% return in a matter of weeks, is indicative of fraud.

**D. The Standby Letter of Credit (SBLC) and SWIFT Message Schemes**

76. I know, based on my experience and training, and consultation with others, legitimate SBLCs exist. SBLCs are issued by banks and serve as a guarantee on behalf of their customer. If the bank's customer fails to fulfill an agreed upon service or contract, such as completing a project on time or issuing payment for goods, the bank pays a third party beneficiary. SBLCs essentially function as collateral, with the issuing bank vouching for their customer. Issuing SBLCs is a common business practice for many large, reputable financial institutions.

US-013377

77. The E-Mail Affidavit, particularly at paragraphs 38 to 41, 46 to 52, and 65 to 75, summarizes facts relating to the SBLC fraud perpetuated using the SBUSA entity.

78. I know from research on this case, including an interview with a SWIFT employee, SWIFT, or Society for Worldwide Interbank Financial Telecommunication, provides a network to allow financial and non-financial institutions to execute financial transactions through a "financial message." SWIFT uses a standardized proprietary communications platform to facilitate the transmission of information about financial transactions. This information includes payment instructions and delivery of financial instruments, such as standby letters of credit and bank guarantees.

79. On March 9, 2015, your affiant contacted Michael Kooyman ("Kooyman"), owner and President of Koy Builders, Inc., regarding his transactions with ARI Capital. An internet search of ARI Capital revealed the company purports to be engaged in commercial financing, and claims to have originated over $2 billion in loans in over 30 countries. The CEO is listed as Nicolette Cain ("Cain").

80. In December 2012, Kooyman wired $137,300 and transferred $145,000 to ARI Capital's business checking account for a total of $282,300. After receiving Kooyman's payments, ARI Capital subsequently wired $202,000 to Kreighton Dacshel LLC, an entity owned and controlled by Taylor.

81. Kooyman's payments were for the purchase of a SBLC and SWIFT message. Kooyman's company, Koy Builders, Inc., is in real estate development. At the time Kooyman was having difficulty obtaining loans from standard domestic banks, and sought alternative financing for his company's projects. Kooyman's associate introduced him to Jonathan Rivas ("Rivas"). Rivas was known to Kooyman's associate as the President of DCDB Group, which purportedly provides financial consulting services.

US-013378

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

82. Rivas told Kooyman a new bank in Argentina, Helvetia International Bancor, would be willing to assist him in obtaining financing.  Rivas offered to provide Kooyman a $500 million SBLC from Helvetia International Bancorp to serve as collateral for Koy Builders Inc.'s new financing.  Kooyman wanted to borrow as much as he could in order to keep a new development project going.  Helvetia International Bancorp was to receive a fee for their SBLC after the financing deal was complete.

83. Rivas informed Kooyman that ARI Capital could provide the SWIFT messaging services on behalf of Helvetia International Bancorp.  Kooyman paid the aforementioned $282,300 to ARI Capital to send the SWIFT message transmitting the SBLC provided by Helvetia International Bancorp.

84. ARI Capital provided Kooyman with documentation of the SWIFT message, but the intended recipient banks had no record of ever receiving it.  Kooyman never received his financing, or a refund of his $282,300.  Rivas did not allow Kooyman to speak with ARI Capital directly to ask why the SWIFT message was never received by the banks.

85. Kooyman's associate informed him Ken Taylor is Cain's partner, and Taylor is associated with Centerlink LLC which provides SWIFT messaging services.  Centerlink appeared on the bottom of the SWIFT documentation received by Kooyman.

86. Between October 26, 2012 and April 23, 2014, "ARI Capital Inc.," owned and operated by Cain, wired $615,000 to Kreighton Dacshel's bank account at First Republic Bank.

87. When questioned by JP Morgan Chase bank employees regarding the business purpose of the outgoing wires to Kreighton Dacshel LLC, Cain responded Kreighton Dacshel LLC is a law firm which provides paperwork preparation

US-013379

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

services for ARI Capital Inc.'s import/export financing transactions.

88. I conducted research and found no internet profile or company website for Kreighton Dacshel containing this information, or any information for that matter. Kreighton Daschel's organizational documents are filed in California (see paragraph 31), so I searched the member directory on the State Bar of California website and found no members of the state bar listing his or her firm as "Kreighton Daschel" or "Kreighton." I did not find Kenneth Alan Taylor listed as a member of the State Bar of California either.

89. Based on my training and experience, companies with minimal or no public profiles are often used for illicit activity such as the investment schemes described herein.

90. An internet search of Helvetia & International Bancor Trust Inc. yielded a website for the bank at helvetiabancor.com. The website provided the address 8063 Madison Ave, #356, Indianapolis, Indiana, as Helvetia's headquarters. An internet search revealed 8063 Madison Ave, #356, Indianapolis, Indiana is a Postal Express store offering mail box services.

91. Based on my training, and conferring with other IRS-CI Special Agents, reputable financial institutions are typically not headquartered in virtual offices, or retail outlets providing mail box services.

92. Your affiant researched the banking system in Argentina. All Argentine financial institutions are governed by the Banco Central de la Republica Argentina (Central Bank of Argentina). Your affiant reviewed an index of banks and financial institutions at the Banco Central de la Republica Argentina's website, www.bcra.gov.ar. Helvetia & International Bancor Trust Inc. is not listed on the index of Argentine banks and financial institutions. Your affiant reviewed a broader index of all institutions falling under the scope of the Argentine financial

US-013380

### Northern District of California
### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

system at www.bcra.gov.ar. Helvetia & International Bancor Trust Inc. did not appear on this listing either.

### E. Undercover Operation - SBLCs and SWIFT Messaging

93. On April 29, 2015, an IRS-CI Cooperating Witness ("CW") introduced an IRS-CI Undercover Agent ("UCA") to Cain. The CW informed Cain the UCA wanted to purchase a SBLC to serve as collateral for a project. The CW informed Cain the UCA required a SWIFT service to send the SBLC. On May 13, 2015, Cain responded from the email account 'nicolette.cain@aricaptl.com,' saying she can assist with the SWIFT service as "I am directly affiliated with Centerlink."

94. The CW does not have a criminal history. The CW identified themselves as a broker working for Rivas' financial consulting firm, DCDB. Information provided by the CW was corroborated by independent sources.

95. On May 14, 2015, Cain emailed the CW from the email account "nicolette.cain@aricaptl.com." Cain said, "I can get a SBLC for $200k for $20k from a Pakistanian Bank. This will not last long as I had to negotiate this price."

96. On May 22, 2015, Cain emailed the CW draft SWIFT verbiage for the UCA from the email account "nicolette.cain@aricaptl.com." The draft SWIFT verbiage listed "centerlink" on the first line of the message.

97. The UCA had telephone conversation with Cain on May 22, 2015, June 11, 2015, and June 16, 2015. During these conversations the UCA made it clear he/she needed the SBLC to serve as collateral for a legitimate development project. Cain confirmed with the UCA she negotiated directly with the bank BTA Kazakhstan to get the price for the SBLC. Cain confirmed the SBLC was real, and could be successfully used for collateral for our UCA to obtain credit.

98. On May 22, 2015, the UCA wired Cain a $4,000 "good faith" deposit for the SBLC and SWIFT service. On June 16, 2015, the UCA wired Cain the remaining

US-013381

### Northern District of California
### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1    $16,000 for a total fee of $20,000.

2    99. Cain never sent the SBLC and SWIFT message to the UCA's bank as agreed

3    upon.  She made excuses and changed her story over the course of several

4    months.  In July 2015, Cain stopped responding to the UCA's voice messages

5    and emails.  The UCA threatened legal action against Cain, but still received no

6    response from her.

7    100.    The UCA initiated contact with Cain again in November 2015, emailing

8    Cain that he had another business opportunity and may need a larger SWIFT

9    message.  Cain responded "it was good to hear" from the UCA.  Cain informed the

10   UCA his/her $200,000 was still available at "Freemont Bank of California," and it

11   could be unlocked for an additional fee of $6,000.

12   101.    This was the first time Cain mentioned "Freemont Bank of California."  It

13   was never discussed during the initial negotiations of the UCA's SBLC and SWIFT

14   message.  Your affiant conducted internet research and could not locate a

15   "Freemont Bank of California."  Your affiant believes Cain is referring to Fremont

16   Bank of California.

17   102.    Cain's residential and business addresses are located near Chicago,

18   Illinois.  Fremont Bank has branches located only in the Bay Area, California.

19   However, your affiant noted Taylor opened a bank account for Kreighton Dacshel

20   LLC at Fremont Bank in May 2015.

21   103.    Fremont Bank did not have record of any account, SBLC or SWIFT

22   messages related to the UCA, the UCA's company, ARI Capital, Nicolette Cain, or

23   Centerlink.

24   104.    The UCA did not pursue any further activity with Cain.  The UCA never

25   received a SBLC, SWIFT message, nor a refund of the $20,000 in fees paid to

     Cain.

US-013382

### Northern District of California
### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

105.    A review of ARI Capital's bank account which received the $20,000 from the UCA revealed Cain spent the funds on personal expenditures, but did not forward any of the proceeds from the UCA to Taylor or Centerlink.

### F.  Money Laundering

106.    Taylor attempted to conceal the source of funds from his investment schemes.  For example, bank records reveal the following:

    a.  On August 3, 2010, Ringgenberg wired $732,862 from the bank account of Double R Horse Ranch LLC, an entity Ringgenberg owns and controls, to the attorney trust account of Howard Neal of Neal and Associates.

    b.  On the next day, August 4, 2010, Neal wired $732,862 from his attorney trust account to "Ken Taylor dba Centerlink LLC."

    c.  From August 5, 2010 through March 9, 2012, Centerlink LLC wired $899,400 from its bank accounts to the account of Clearfog Investments LLC.  In addition, Centerlink LLC wired Taylor $199,400 during this time period.

    d.  From August 23, 2010 through March 9, 2012, Clearfog Investments LLC transferred approximately $350,000 to Taylor's personal checking account.

107.    Howard Neal is the registered agent for several of Taylor's companies, including Clearfog Investments LLC, Clearfog Trading, LLC, and Centerlink LLC. According to the State Bar of California's website, a Howard Dennis Neal, with an Oakland business address, has been a member of the California Bar since 1974.

108.    Based on my experience and training and consultations with other law enforcement personnel, I know individuals engaging in fraud frequently avail themselves of attorney client trust accounts to obscure or conceal the nature of their transactions and identities of transactors.

US-013383

### Northern District of California
### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

109.     Bank records indicate Kreighton Dacshel LLC received approximately $1.6 million in third party wire transfers from August 31, 2012 through December 10, 2014, $513,000 of which were received from law firms, including the respective attorneys' client trust accounts.

110.     In July 2012 JP Morgan Chase bank employees interviewed Robert Hart ("Hart"), from the Law Offices of Robert Hart, about his transactions with Centerlink LLC.  Hart explained he typically executes escrows related to investment activity on behalf of Taylor and Taylor's associates.  Hart is often unaware what the purpose of the transaction is and the ultimate destination of funds.  Hart felt the transactions were always high pressure and that he needed to drop everything to complete them per the client's request.  Hart claimed he no longer does business with Taylor due to the high pressure nature of the transactions, lack of knowledge regarding the ultimate destination of funds, and offshore account activity.

111.     Based on my training and experience, layering transactions through attorneys and offshore business entities, churning funds amongst commonly owned businesses, and conducting transactions with no clear business purposes is indicative of money laundering, specifically concealing funds from a specified unlawful activity.

### G. Foreign Bank Account

112.     Between May 5, 2010 and March 9, 2012, Clearfog Investment LLC's checking account at Bank of America received $1,088,884 in wire transfers.  During the same period Taylor's personal checking account at Bank of America received an additional $218,400 in wire transfers.  Out of the $1,307,284 in total wire transfers, $1,118,300 was received from Centerlink LLC.

US-013384

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

113.    A significant amount of wire transfers to Clearfog Investments LLC's and Taylor's Bank of America accounts were from Centerlink LLC's bank account at Heritage International Bank and Trust Limited, 35 Barrack Road, Belize City, Belize.  The wire transfers from Heritage International Bank and Trust Limited are summarized as follows:

| Year | 2010 | 2011 | 2012 |
|---|---|---|---|
| Total Wire Transfers | $49,000 | $234,500 | $134,000 |

114.    In order to have sufficient funds to wire the sums listed in the table above, the account balances in Centerlink LLC's account at Heritage International Bank and Trust Limited needed to be greater than $10,000 at some point in the respective calendar year.

115.    Taylor is closely associated with Centerlink LLC.  Taylor has been listed as a signer on Centerlink LLC's bank accounts.  Centerlink LLC's address has listed the Target Premises, Taylor's personal residence, 6877 Elverton Drive, Oakland, California, on several bank wires, and Centerlink LLC's California Secretary of State filing.  Taylor is likely to have both a financial interest and signature authority on Centerlink LLC's bank account in Belize.  Individuals with a financial interest and/or signature authority on foreign bank accounts, with an aggregate balance of $10,000 or more at any point during the calendar year, are required to file FinCEN Report 114, Report of Foreign Bank and Financial Accounts.  Taylor has never filed such a report.

US-013385

**Northern District of California**
**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

## H. Income Tax Filings

116.     For the tax years 2007 through 2010, Taylor reported Clearfog Investments LLC on Schedule C – Profit or Loss from Business as part of his Form 1040 – U.S. Individual Income Tax Return.  In order for a LLC to be eligible to be reported on a Schedule C, the LLC must be a "single member" LLC, owned and operated by a single member.

117.     Taylor's taxable income as reported on Forms 1040 – U.S. Individual Income Tax Return is summarized in the table below.

| Description | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Gross wages | $0 | $0 | $0 | $0 | Not Filed | Not Filed | Not Filed | Not Filed |
| Taxable interest | 0 | 0 | 0 | 0 | | | | |
| Dividends | 0 | 0 | 0 | 0 | | | | |
| Business income - CLEARFOG INVESTMENTS (see detail below) | (215,426) | (8,909) | 48,281 | 140,641 | | | | |
| Capital gain or (loss) - Schedule D | (3,000) | (3,000) | (3,000) | (3,000) | | | | |
| Rental real estate, royalties, partnerships, S corporations, trusts, etc. | 0 | 0 | 952 | 0 | | | | |
| NOL Carryover | 0 | (215,426) | (224,335) | (173,471) | | | | |
| Total income | (218,426) | (227,335) | (178,102) | (35,830) | | | | |
| **Schedule C - CLEARFOG INVESTMENTS** | | | | | Not Filed | Not Filed | Not Filed | Not Filed |
| Gross Receipts | 156,245 | 135,654 | 243,638 | 348,622 | | | | |
| Cost of Goods Sold | 0 | 0 | 0 | 0 | | | | |
| Expenses | (371,671) | (144,563) | (195,357) | (207,981) | | | | |
| Expenses for use of home | 0 | 0 | 0 | 0 | | | | |
| Net profit or (loss) | (215,426) | (8,909) | 48,281 | 140,641 | | | | |

118.     Clearfog Investments, LLC and Taylor received the following wires to their respective Bank of America accounts:

US-013386

128.     As discussed in the E-mail Affidavit, an individual using the name Patrick Harris, purportedly an attorney working for Success Universe Group Limited, sent emails to a victim in May 2010 who did business with SBUSA.  According to Hong Kong detectives who interviewed a representative from the legal department of Success Universe Group Limited, no one named Patrick Harris had worked in the legal department of the company.  Your affiant believes the emails to victims purporting to come from Patrick Harris, an attorney with Success Universe Group Limited, were hoaxes.

129.     Email subscriber records were obtained from GoDaddy.com and Comcast for the Internet Protocol (IP) address assigned to the email accounts linked to successbullionusa.com.  The records showed thousands of instances where someone logged into the email account for Sharon@successbullionusa.com in 2009 through 2011.  This was the email address for the person identifying herself as Sharon Ringgenberg, Vice President of Operations for Success Bullion.  The records also showed 13 instances in 2009 and 2010 when someone logged onto the email account for Patrick@successbullionusa.com.  This was the email address used by the person purporting to be an attorney employed by SBUSA named Patrick Harris.

130.     A review of the IP records from Comcast for these email addresses, revealed on August 12, 2010 someone logged into the account for Patrick Harris from the Target Premises.  It was also determined there were another eight instances in which someone logged into the account for Sharon@successbullionusa.com in October and November 2010 from the Target Premises.

131.     Under Bank of America customer information, the addresses listed for Clearfog Investments LLC and Clearfog Trading LLC are the Target Premises.

US-013387

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Accounts statements for Clearfog Investments LLC and Clearfog Trading LLC for the period May 2008 through June 2012 list the Target Premises as the entity's address. Based on records from the United States Postal Service, on July 5, 2012 Clearfog Investments LLC and Clearfog Trading LLC received correspondence at the Target Premises from Bank of America.

132.    JP Morgan Chase customer information lists Centerlink LLC's address as the Target Premises. The customer information lists 'Taylor' as a 'Signer'. JP Morgan Chase account statements for Centerlink LLC for August 2010 through October 2012 list the Target Premises as the entity's address. Based on records from the United States Postal Service, on July 14, 2012 Centerlink LLC received correspondence at the Target Premises from Chase bank.

133.    On February 24, 2015, I visited 6114 La Salle Ave, Oakland, California, and observed the address is a United Parcel Service (UPS) Store. I observed a small mailbox, approximately 4"x 4", labelled "651." The UPS Store offers mailbox services, including mail forwarding, call-in mail check, and package acceptance. Based on store records, mailbox number '651' is rented by 'Kenneth Taylor' of 'Clearfog Investments LLC.'

134.    The organizational documents for Kreighton Dacshel LLC filed with the State of California on June 19, 2012 list the entity's address as the Target Premises.

135.    JP Morgan Chase bank customer information lists Kreighton Dacshel LLC's address as the Target Premises. JP Morgan Chase bank account statements for Kreighton Dacshel LLC for June 2012 through December 2012 list the Target Premises as the entity's address.

136.    On July 24, 2012, a wire was sent from a business account at Capital One Bank to Kreighton Dacshel LLC's bank account at Washington Mutual. The

US-013388

beneficiary address on the wire sheet was listed as the Target Premises.

137.    A 'Master Signature Card and Agreement to Open Accounts (s)' for Kreighton Dacshel LLC at First Republic Bank dated August 12, 2012 lists the entity's address as the Target Premises.  Taylor executed the agreement and is listed as the sole authorized signer on the account.  Taylor described his employer as Kreighton Dacshel LLC, his employer's address as the Target Premises, and his occupation as 'CEO.'  Taylor provided a fax number on the agreement.

138.    On a 'Business Information Form' signed by Taylor as "true and correct" on August 28, 2012, and submitted to First Republic Bank, Taylor lists the physical address of Kreighton Dacshel LLC as the Target Premises.  On the portion of the form completed by a First Republic Bank employee per First Republic Bank's 'Know Your Customer' policy, the form indicates the employee spoke with 'Kenneth Taylor,' who is the 'Owner' of Kreighton Dacshel LLC.  The form includes the question, 'Is this business operating at the site address provided?' and 'Yes' is checked.  The form includes the question, 'Does there appear to be adequate inventory for this type of business?  If 'Yes, describe inventory'.  'Yes' is checked, and 'Computer' is noted next to the question.

139.    First Republic Bank's records for Kreighton Dacshel LLC included the assignment of an Employer Identification Number by the IRS.  On the notice from the IRS, the business entity is listed as Kreighton Dacshel and the business' address is listed as the Target Premises.

140.    On September 17, 2012, a wire was sent from Kreighton Dacshel LLC's First Republic Bank account to a business account at Capital One Bank.  The originator address on the wire sheet was listed as the Target Premises.

141.    Account statements for Kreighton Dacshel LLC's bank account at First Republic Bank for the period August 2012 through October 31, 2015 lists the

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

entity's address as the Target Premises.

142.     On April 25, 2015, your affiant observed a white Landrover sports utility vehicle, California license plate 'TAYLORZ' driving south on Elverton Drive towards Skyline Boulevard.  The driver of the vehicle matched the appearance of Taylor.  Based on DMV records, the vehicle is registered to Kenneth Taylor at the Target Premises.

143.     On a 'CIP information' sheet dated May 13, 2015 from Fremont Bank for Kreighton Dacshel LLC signed by Ken Taylor, Taylor is listed as the owner of the entity.  On Fremont Bank account statements for Kreighton Dacshel LLC for the period May 2015 through November 2015 the entity's address is listed as the Target Premises.

144.     Based on records from the United States Post Office, during the period November 24, 2015 through December 23, 2015, Kreighton Dacshel LLC received correspondence from First Republic Bank and American Express at the Target Premises.

145.     Kreighton Dacshel LLC received a notice dated December 2, 2015 from the California Secretary of State addressed to the Target Premises.

146.     During the investigation your affiant did not discover any other physical address listed as the business address for Kreighton Dacshel LLC.

147.     Based on records from the United States Postal Service, on July 5, 2012 Kreighton Dacshel LLC received correspondence at the Target Premises from Jaguar.

148.     On January 28, 2015, February 23, 2015, and April 7, 2015, February 1, 2016, February 8, 2016, I observed a dark colored Jaguar automobile, California license plate number 7CBV383, parked in the driveway of the Target Premises.  Per California Department of Motor Vehicle (DMV) records, the registered owner

US-013390

## Northern District of California
## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

of the Jaguar is Kreighton Dacshel LLC / Taylor, Kenneth.  On the DMV

registration the address for Kreighton Dacshel LLC / Taylor, Kenneth is listed as

6114 La Salle Ave, #651, Oakland, California.

### VII. CONCLUSION AND REQUEST FOR SEALING

149.      Based on the investigation to date, as described by the facts set forth in

this affidavit, and on my training and experience, along with consultation with

other law enforcement personnel, I have probable cause to believe that criminal

offenses against the United States have occurred, namely acts to attempt to

defeat the assessment of a tax or payment thereof in violation of Title 26 United

States Code, Section 7201; to willfully make and subscribe to a materially false

return in violation of Title 26 United States Code, Section 7206 (1); to willfully

violate foreign bank account reporting requirements per Title 31 United States

Code, Section 5314 and 5322(a); to commit, and to conspire and/or attempt to

commit, wire fraud per Title 18 United States Code, Sections 1343 and 1349; to

conduct financial transactions in order to conceal funds from a specified unlawful

activity in violation of Title 18 United States Code, Section 1956(a)(1); and to enter

into an agreement or conspiracy to defraud the government in violation of Title 18

United States Code, Section 371.

150.      Furthermore, I believe there is probable cause to believe that evidence,

fruits, and instrumentalities of those crimes, as more specifically described in

Attachment B, will be found at the Target Premises,

### 6877 Elverton Drive, Oakland, California,

as more fully described in Attachment A.  Accordingly, I request that a search

warrant be issued authorizing the search of the Target Premises for those items

identified in Attachment B.

151.      The criminal investigation regarding the facts set forth in this affidavit is

US-013391

### Northern District of California
### <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

1   continuing.  A number of additional interviews, subpoenas, and other investigative

2   measures are contemplated in the very near future.  Disclosure of the contents of

3   this affidavit at this time would seriously impede the continuing investigation and

4   prosecution by disclosing the details of the Government's investigation, which

5   could potentially cause target(s) or subject(s) of the investigation to flee, destroy

6   evidence, or intimidate and attempt to corruptly influence potential witnesses in

7   the case.  Such activity would seriously impede the investigation and prosecution.

8   Accordingly, I respectfully requested that the Court issue an order sealing this

9   search warrant, affidavit, application and the attachments thereto until further

10   order of this Court.

11
12                                                                 James Hade, Special Agent
13                                                                 Criminal Investigation
                                                                   Internal Revenue Service
                                                                   U.S. Department of the Treasury

14   Subscribed and sworn to me this

15   _____ day of February, 2016

16

17

18   Hon. MARIA-ELENA JAMES
     United States Magistrate Judge
19   Northern District of California

20

21

22

23

24

25

US-013392

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The property residence located at 6877 Elverton Drive, Oakland, California.  The property appears to be a multi-story residential building, with tan exterior, grey tile roof, and wood colored garage door.  The numbers "6877" are affixed to the exterior of the building to the right of the garage door.  The search shall include all rooms and all other parts therein, as well as surrounding grounds, garages, storage rooms and outbuildings of any kind, attached or unattached, located on the premises relating to address stated above. (Photographs depicting the home are attached below.)





Attachment A
Special Agent James Hade

US-013393

## ATTACHMENT B

### ITEMS TO BE SEIZED

For the period January 1, 2006 through the present, all items and records which constitute evidence, fruits, or instrumentalities of violations of 26 U.S.C. §§ 7201 (attempting to evade the assessment of a tax or payment thereof), 7206(1) (willfully making and subscribing to a materially false return); 31 U.S.C. §§ 5314, 5322(a) (willful violation of foreign bank and financial account reporting requirements); and 18 U.S.C. §§ 371 (conspiracy to commit an offense or defraud the government), 1343, 1349 (wire fraud & wire fraud attempts/conspiracy), 1956(a)(1) (money laundering – financial transaction offense), including the items listed below.

As used in this Attachment, the terms "records," "documents," and "materials" include all of the items described herein, in whatever form and by whatever means they may have been created and/or stored.  This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms.  It also includes items in the form of computer hardware, software, documentation, passwords, electronic mail, and/or data security devices.

I.  **The Items to Be Seized are those items relating to the following individuals and entities:**

A.  KEN TAYLOR;

B.  YAVAIR TAYLOR;

C.  SHARON RINGGENBERG;

D.  CHRIS JANN;

E.  CLEARFOG INVESTMENTS, LLC;

F.  CLEARFOG TRADING, LLC;

G.  CENTERLINK, LLC;

H.  KREIGHTON DACSHEL, LLC;

I.  RAIGOLD;

J.  SUCCESS BULLION USA or SUCCESS BULLION, LLC

K.  SUCCESS UNIVERSE GROUP (Hong Kong);

L.  PRESTIGIOUS BUSINESS SOLUTIONS;

M.  CRAIG SCOTT and the SCOTT INVESTMENT GROUP;

N.  DARRYL MORRIS and QUANTUM INTERNATIONAL TRADING;

## ATTACHMENT B

## ITEMS TO BE SEIZED

O.  TONI HARDSTONE and COMMERCIAL ESCROW SERVICES;

P.  AMERICAN UNITED TITLE & ESCROW;

Q.  NICOLETTE CAIN and ARI CAPITAL

R.  JONATHAN RIVAS and DCDB GROUP;

S.  HELVETIA INTERNATIONAL BANCORP;

T.  ROBERT HART;

U.  HOWARD NEAL;

V.  BARBARA FIGARI and FIGARI LAW;

W.  Entities with variations of the names above; and

X.  Any other entities and individuals engaging in financial transactions with the individuals and entities listed above.

II.  **The Items to Be Seized are more specifically identified as:**

A.  All records, files, correspondence, or other items relating to stand by letters of credit (SBLC), proof of funds, platform trading, FOREX transactions, or other financial instruments.

B.  All records, files, correspondence, or other items relating to National Futures Association (NFA), Commodity Futures Trading Commission (CFTC), Nevada Attorney General, or Federal Bureau of Investigation (FBI).

C.  All records, files, correspondence, or other items relating to wires, deposits, and transfers involving any attorney trust account or Interest on Lawyer Trust Accounts (IOLTAs).

D.  Equipment and records related to the preparation and transmission of SWIFT messages; including all related client listings, broker listings, notes and memoranda. All correspondence related to the preparation and transmission of SWIFT messages, including; letters, notes, electronic mail, and facsimile.

E.  Business records including; books and records used in the preparation of business and financial statements, income statements, profit and loss statements, balance sheets, trial balances, financial summaries, financial worksheets, general ledgers, general journals, sales ledgers, sales journals, accounts receivable reports, cash receipts journals, cash disbursement journals, check registers, purchase receipts, receipt books, payroll records, client listings,

## ATTACHMENT B

## ITEMS TO BE SEIZED

broker listings, all of which would be used to determine the amount of income, expenses, deductions, net income, taxable income and the tax liability of the individuals and entities listed above.

F. All records, documents, files, or other items relating to the rental or leasing of office space, mail boxes, postal boxes, or storage facilities, including electronic or "cloud-based" storage.

G. All records related to business or personal expenses and investments, including; sales invoices, purchase invoices, sales receipts, credit card statements, cancelled checks, closing statements, notes, contracts, purchase agreements and loan documents.   All correspondence related to business or personal expenses and investments including; letters, notes, electronic mail, and facsimile.

H. Employee personnel records, including lists of employees and employee information such as Social Security Number, address, telephone number, electronic mail (e-mail) address, or other identifying information.  Any schedules or other records of payments made to employees by check or cash (currency).

I. Financial institution, brokerage company, and bank documents more particularly described as signature cards, applications, account statements, savings passbooks, cancelled checks and checks to cash, deposit slips, bank checks, check registers, cashier's checks, money orders, withdrawal slips, records disclosing the disposition of withdrawals, wire transfers and wire instructions, promissory notes, negotiable instruments, safe deposit box records and keys, storage unit records and keys, all of which relate to the amount of income, expenses, deductions, and the tax liability of the individuals and entities listed above.

J. Federal and state income and payroll tax returns, schedules, IRS forms, preparation instructions and schedules, worksheets, letters and notices to or from the Internal Revenue Service or Franchise Tax Board, tax-related documents, notes and correspondence.

K. Any and all documents related to the use of nominee names and accounts or the attempt to conceal assets and income.

L. All items indicative of contracts, family relationships, fiduciary, or financial relationships among any of the individuals and entities listed above, or their officers, employees, or contractors.

M. Records relating to the acquisition, disposal, ownership, and control of property or other assets by the above-listed individuals and entities.

US-013396

## ATTACHMENT B

## ITEMS TO BE SEIZED

N. Loan and line-of-credit records including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash, check, or money order), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files, and internal memoranda relative to these loans.

O. Any indicia of use, ownership, possession, or control of items or records listed above to be sought or indicia of ownership or use of any specific location or equipment containing the above-listed items, including rental and/or lease records, computer logs, utility and telephone bills, and mail.

### III.  Computers and Electronic Evidence

The items above also include records, documents, programs, applications or materials created, modified or stored in any form, including, but not limited to, electronic format or as computer data, and also include the following:

A. Any computer equipment and storage device capable of being used to commit, further or store such computer data (to include, but not limited to, SWIFT messaging-related equipment, hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips, thumb drives, secure digital media used in phones and cameras, personal music devices, Smart Phones, PDAs, cellular telephones, tablet computer devices, and any other devices or similar items capable of storing electronic communications and/or data);

B. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

C. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

D. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

E. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

## ATTACHMENT B

### ITEMS TO BE SEIZED

F.  Any written or computer communication relating to the items sought above, in printed or stored medium, such as E-Mail and Chat Logs whether in active files, deleted files or unallocated space on the hard drives, floppy drives, thumb drives, or any data storage media;

G.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

H.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

I.  Any "contextual data," that is, evidence of how a digital device has been used, what it has been used for and who has used it, including, but not limited to, file directories and file/folder structure data, message transmission records, and records of Internet activity (use of and log ins to emails, financial, or other web sites), and other user-provided data.

Attachment B
Special Agent James Hade

US-013398

ATTACHMENT C

United States District Court for the Northern District of California

## *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

1.     In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.     If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.     In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.     When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

(December 10, 2010)

1

US-013399

ATTACHMENT C

5.     When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.     Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.     The time periods set forth in this protocol may be extended by court order for good cause.

8.     In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.     For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

(December 10, 2010)

2

US-013400

### ATTACHMENT D

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Steven C. Coffin, a Special Agent with the Federal Bureau of Investigation ("FBI"), San Francisco Division, San Francisco, California, being duly sworn, depose and state as follows:

A.   Agent Background and Introduction

1.    I have been a Special Agent of the FBI since June 1998. I have a law degree from the University of Virginia, and I served over four years as an attorney in the U.S. Air Force.   I am currently assigned to the FBI San Francisco Division, Concord Resident Agency.   Since joining the FBI, I have investigated violations of federal law in white collar crimes.   I have gained experience through previous employment, training, and everyday work related to conducting these types of investigations.   As a Special Agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2.    I make this Affidavit in support of search warrant applications for the contents of the following target emails:

a.    the email accountscraigscott84@gmail.com and jannchris@gmail.com hosted by the free, web-based, electronic mail (email) service provider known as Google, Inc., headquartered at, 1600 Amphitheatre Pkwy, Mountain View, California;

b.    the email accounts sharon@successbullionusa.com, and

US-013401

## ATTACHMENT D

patrick@successbullionusa.com, hosted by the web-based

email service provider known as GoDaddy.com, located at

14455 North Hayden Road, Suite 219, Scottsdale,

Arizona; and

c.     the email account avanaki@mypbsolutions.com hosted by

the web-based email service provider known as 1&1

Internet Inc., located at 701 Lee Road, Suite 300,

Chesterbrook, Pennsylvania.

As set forth below, there is probable cause to believe that the
contents of these email accounts stored on the computer systems
of Google, GoDaddy.com, and 1&1 Internet contain evidence and
instrumentalities of violations of Title 18, United States Code,
Section 1343 (Wire Fraud), from December 1, 2008 to the present.

B.     Search Procedure

3.     In my training and experience, I have learned that
Google provides web-based Internet email access to the general
public, and that stored electronic communications, including
opened and unopened email for Google subscribers may be located
on the computer.  Likewise, in my training and experience, I have
learned that GoDaddy.com and 1&1 Internet provide website support
for pay-for-service clients, including web-based Internet email
service, and that stored electronic communications, including
opened and unopened email for GoDaddy.com and 1&1 Internet
clients may be located on their computer servers.  Further, I am

2

US-013402

aware that computer servers located at Google, GoDaddy.com, and 1&1 Internet (the "Account Providers") contain information and other stored electronic communications belonging to unrelated third parties.  Accordingly, this affidavit and application for search warrants seeks authorization solely to search the computer accounts and/or files identified herein and seeks authorization to do so solely following the procedures described.

4.    In order to ensure that agents search only those computer accounts and/or files described, I request authorization to permit employees of the Account Providers to assist agents in the execution of these warrants.  To further ensure that agents executing this warrant search only those computer accounts and/or files described in Attachments A1 (Google), A2 (GoDaddy.com) and A3 (1&1 Internet), the following procedures will be implemented:

a.    The search warrant will be presented to the Account Providers' personnel who will be directed to isolate those accounts and files described;

b.    In order to minimize any disruption of computer service to innocent third parties, the Account Providers' employees and law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Attachments A1-A3, including an exact duplicate of all information stored in the computer accounts and files described in Attachments A1-A3;

US-013403

*ATTACHMENT D*

c.    The Account Providers' employees will provide the exact duplicate in electronic form of the accounts and files described and all information stored in those accounts and files to the agent who serves the search warrants;

d.    Law enforcement personnel will thereafter review the information stored in the accounts and files received from the Account Providers and then identify and copy the information contained in those accounts and files that are authorized to be further copied by the search warrants; and

e.    Law enforcement personnel will then seal the original duplicate of the accounts and files received from the Account Providers and will not further review the original duplicates absent an order of the Court.

C.    **Background Regarding Computers, the Internet, and Email**

5.    The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

6.    Based on my training, experience and knowledge, I know the following:

a.    The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and

4

US-013404

**_ATTACHMENT D_**

universities.  In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet.  The World Wide Web ("www") is a functionality of the Internet, which allows users of the Internet to share information;

  b. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world.  This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods; and

  c. Email is a popular form of transmitting messages and/or files in an electronic environment between computer users.  When an individual computer user sends email, it is initiated at the user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination.  A server is a computer that is attached to a dedicated network and serves many users.  An email server may allow users to post and read messages and to communicate via electronic means.

  7. Based on my training and experience, I have learned the following about email service provided by the Account Providers:

  a. The Account Providers maintain electronic records pertaining to the individuals and companies for which they maintain subscriber accounts ("subscribers").

US-013405

## *ATTACHMENT D*

These records include account access information, email transaction information, and account application information;

b.   Subscribers may access their accounts on servers maintained and/or owned by the Account Providers from any computer connected to the Internet located anywhere in the world;

c.   Any email that is sent to a subscriber is stored in the subscriber's "mail box" on the Account Providers' servers until the subscriber deletes the email or the subscriber's mailbox exceeds the storage limits preset by the Account Providers.  If the message is not deleted by the subscriber and the account is below the maximum limit, the message can remain on the Providers' servers indefinitely.  This assumes the subscriber accesses the account periodically to keep his/her account active;

d.   When the subscriber sends an email, it is initiated at the user's computer and is transferred via the Internet to the recipient's mail servers.  Users have the option of saving a copy of the email sent.  Unless the sender of the email specifically deletes the saved message from the Provider's server, the email can remain on the system indefinitely.  The message can also remain in

6

## *ATTACHMENT D*

the recipient's email box unless the recipient deletes
it or unless the recipient's account is subject to
account size limitations;

e.   A subscriber can store files, including emails and
image files, on servers maintained and/or owned by the
Account Providers; and

f.   Emails and image files stored on Account Providers'
servers by a subscriber may not necessarily be located
in the subscriber's home computer.  The subscriber may
store email and/or other files on Provider's server for
which there is insufficient storage space in the
subscriber's computer and/or which he/she does not wish
to maintain in the computer in his/her residence.  A
search of the files in the computer in the subscriber's
residence will not necessarily uncover the files that
the subscriber has stored on a Provider's server.

D.   Applicable Law

8.   Title 18, United States Code, Section 1343, "Fraud by
Wire, Radio, or Television" prohibits the following conduct:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by
> means of false or fraudulent pretenses, representations, or
> promises, transmits or causes to be transmitted by means of
> wire, radio, or television communication in interstate or
> foreign commerce, any writings, signs, signals, pictures, or
> sounds for the purpose of executing such scheme or artifice,
> shall be fined under this title or imprisoned not more than
> 20 years, or both.

7

US-013407

*ATTACHMENT D*

E.   Stored Wire and Electronic Communications Access

9.   The legal authority for this search warrant application is derived from 18 U.S.C. §§ 2701-11, entitled "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides in relevant part as follows:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction.  A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

10.  Section 2703(b) provides in relevant part as follows:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection —

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction; . . . .

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service —

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and
(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of

8

US-013408

## *ATTACHMENT D*

providing any services other than storage or computer processing.

11.   A court of competent jurisdiction is defined to include any magistrate court in a district that has jurisdiction over the offense being investigated.  18 U.S.C. § 2711(3)(A)(i).  The government may also obtain records relating to email communications, such as subscriber identifying information, by way of a search warrant, pursuant to 18 U.S.C. § 2703(c)(1)(A). No notice to the subscriber is required, pursuant to 18 U.S.C. § 2703(c)(3).

F.   **Source of Information Contained Herein**

12.   The statements contained in this affidavit are based on my experience and background as a Special Agent and on information provided to me by other FBI agents, professional staff with the FBI, and investigators and attorneys with the Commodity Futures Trading Commission ("CFTC") and the Nevada Attorney General's Office, and detectives with the Hong Kong Police Department.  As a result of my personal participation in this investigation, I am familiar with the circumstances of the offenses described in this affidavit.  My familiarity is based upon information received from interviews of witnesses and co-conspirators as well as review of documents and records compiled and/or obtained during the investigation.

13.   Because this Affidavit is submitted for the limited purpose of securing authorization for the search warrants of

9

US-013409

stored wire communications, I have not included each and every
fact known to me concerning this investigation.  I have set forth
only the facts that I believe are necessary to establish the
necessary foundation for the search warrants.

G.   **Summary of Facts Supporting Probable Cause**

14.  The scheme in this case involves a loose network of
brokers who entice investors to buy or lease fraudulent financial
instruments issued by a brokerage firm in San Francisco.  The
brokers are not licensed to sell securities.  Likewise, the
financial instruments issued by the brokerage firm are not
legitimate.

15.  The unlicensed brokers sometimes market their financial
instruments as mechanisms that will purportedly allow the victims
to obtain financing for their projects, such as real estate
developments, that cannot obtain conventional financing.  In
other cases, the unlicensed brokers convince the victims that
their investments will allow them to take part in a vaguely
described overseas private marketplace in which a trader, acting
on their behalf, will reap amazing returns for the investors.
The unlicensed brokers use a variety of terms for their
investment schemes, including "private placements," "trading
platforms," and "proofs of funds."  Unlicensed brokers tell
clients hoping to obtain financing that it can be accomplished
using a financial instrument known as a "standby letter of

US-013410

## ATTACHMENT D

credit."  In emails the schemers refer to these as "SBLCs."
Standby letters of credit have a legitimate use in commerce, but
not as a form of leased collateral, as suggested by the
unlicensed brokers in this scheme.  Two of the unlicensed brokers
involved in this scheme are Craig Scott of Concord, California,
and Anthony Vanaki of Lake Forest, California.

16.  At the center of this network of unlicensed brokers,
and key to the scheme's functioning, is Success Bullion USA
("Success Bullion") of San Francisco, California.  The unlicensed
brokers often inform the investors that Success Bullion plays a
central role in their deals, including issuing the standby
letters of credit.  Likewise, participants in the scheme email
statements to investors falsely showing that traders have access
to accounts worth over $100 million.

17.  Success Bullion is used to create the appearance of an
authentic investment opportunity and lend credibility to the
unlicensed brokers.  Success Bullion, which was originally
created by Chris Jann under the name Raigold LLC, is a member of
the National Futures Association ("NFA").   NFA has licensed
Success Bullion to act as a foreign exchange ("FOREX") trading
firm.  The General Manager of Success Bullion, Chris Jann, also
holds a NFA license to engage in FOREX trading.  Success Bullion
has an address in the Financial District of San Francisco.  Its
website falsely shows it to be a subsidiary of Success Universe

11

US-013411

**ATTACHMENT D**

Group Limited of Hong Kong("SUGLHK"), a large multinational firm whose stock is publicly traded in the stock market of Hong Kong. Success Bullion's website also has a link to SUGLHK's website. Calls to Success Bullion's phone number are answered by an electronic service that channels callers to the Vice President of Operations, Sharon Ringgenberg.  Ringgenberg answers questions from potential investors.  She vouches for the unlicensed brokers' legitimacy, touts their track record, and identifies them as authorized dealers of the exotic financial instruments issued by Success Bullion.  When investors wire funds to the unlicensed brokers' designated escrow agents, Ringgenberg sometimes emails complex FOREX account statements to the escrow agents, who in turn email them to the investors.  In essence, Success Bullion's own outward trappings of legitimacy entice victims to both invest in the unlicensed brokers' schemes and then believe they have obtained legitimate financial instruments.

18.  Success Bullion is actually a sham.  Neither Success Bullion nor its officers are associated with the so-called parent company SUGLHK.  The investors do not receive legitimate financial instruments.  Their invested funds are divvied up between the unlicensed brokers and those associated with Success Bullion.  The investors' funds are not used to create exotic financial instruments or invested in a shadowy global marketplace.  On the contrary, bank records indicate the funds

12

US-013412

**_ATTACHMENT D_**

are used for the personal benefit of the schemers. The investors lose their entire investment.

19. When investors complain, the unlicensed brokers either disappear or blame the problems on others. Some investors, after receiving no return on their investment, complain to Ringgenberg, who often acts shocked and distressed but lays the blame elsewhere. The parties blamed by Ringgenberg and the unlicensed brokers are typically overseas or impossible to reach. If investors complain too much to Ringgenberg, they may be threatened by legal action from someone identifying himself as Patrick Harris, claiming to be an attorney with Success Bullion and SUGLHK. I have been unable to identify the existence of Patrick Harris, but he is not associated with SUGLHK.

20. Sharon Ringgenberg has a felony record with a conviction in California in 1993 for offering or selling unqualified securities. She was interviewed by a FBI agent for an apparently unrelated matter on March 29, 2010. Attorney Ismail Ramsey represented her during the interview. Ringgenberg resides in Martinez, California.

21. Chris Jann does not have a criminal record. He resides in San Francisco, California.

22. Craig Scott does not have a criminal record. He resides in Concord, California.

23. Anthony Vanaki, also known as Arash Amir Vanaki, does

13

US-013413

## *ATTACHMENT D*

not have a criminal record.   He resides in Irvine, California.

24.   Ringgenberg, Jann, and others, including the unlicensed brokers affiliated with Success Bullion, frequently send emails in furtherance of the scheme.   Through use of these email messages, which are often sent across state lines:

  a.   Ringgenberg provides false FOREX account statements and other financial information to unlicensed brokers and escrow companies;

  b.   Unlicensed brokers and escrow companies provide false Success Bullion documents to investors;

  c.   Unlicensed brokers instruct escrow agents to wire investors' funds to themselves and to Success Bullion/Ringgenberg;

  d.   Representatives of Success Bullion and affiliated unlicensed brokers entice victims to invest; reassure them; or, when the investors become unreconcilable, shift blame to others;

  e.   Chris Jann corresponds with the NFA to keep the licenses for himself and Success Bullion in good standing.

Some of the email addresses used to send one or more of the above false statements include sharon@successbullionusa.com, patrick@successbullionusa.com, avanki@mypbsolutions.com, craigscott84@gmail.com, and jannchris@gmail.com.

14

US-013414

**_ATTACHMENT D_**

25.  Each of the email addresses for which content is sought
through this search warrant application was used to transact the
fraudulent business of Success Bullion.  In my experience, it is
uncommon for the users of email addresses to methodically delete
business-related emails because they serve as business records
and are useful in dealing with victims and in other matters
related to operation of the fraud.

H. Facts Supporting Probable Cause

Information Provided by Karen and Sara Buchanan

26.  On January 12, 2011, I interviewed Karen and Sara
Buchanan.  The Buchanans were enticed to invest in a "proof of
funds" opportunity by Lars Harrison.  Harrison explained to the
Buchanans that, for an investment of $200,000, they could obtain
a line of credit for $100,000,000 usable for forty weeks.  With
this line of credit as proof of their wealth, Harrison said a
trader would act on their behalf and attempt to earn a profit in
an exclusive and secretive global market.  Harrison said oil and
gold were frequently traded in this marketplace.  Anthony Vanaki,
Martin Eerhart, and Michael Franklin would manage this "proof of
funds" investment.  Franklin would be the actual trader.
Harrison said they had successfully managed similar investments
in the past, and historical returns ranged between $10 million
and $40 million.

15

US-013415

## ATTACHMENT D

27. Because the Buchanans lacked the means to invest $200,000, Harrison said he would find other investors to join them. On August 27, 2009, at Harrison's instruction, Karen Buchanan wired $100,025 from her JP Morgan Chase account in Prospect Heights, Illinois, to American United Title & Escrow ("American Escrow") of Henderson, Nevada. Soon thereafter, Gina Thomas, an escrow officer from American Escrow, emailed a FOREX account statement to Karen Buchanan.

28. The Buchanans never received any return on their investment. They repeatedly telephoned Success Bullion to get updates about the trading. Sharon Ringgenberg finally returned their calls and said she could not get into the middle of a dispute between investors and their trader. She said she would have Vanaki call them. Ringgenberg identified Vanaki as a broker working with Success Bullion. Vanaki subsequently called the Buchanans, and said the fault was with the global marketplace, where Franklin was not able to conduct the trades as promised. The Buchanans were never able to contact Franklin.

Email messages provided by Karen Buchanan

29. Karen Buchanan provided me with several email messages received by her in Illinois, including an email from the American Escrow officer Gina Thomas in Nevada. Attached to the email was a one page FOREX account statement from Success Bullion USA. The

16

US-013416

## *ATTACHMENT D*

statement showed an account, in Buchanan's name, containing a balance of $100,996,500, which was fictitious.

### Information Provided by the Nevada Attorney General

30.   On January 24, 2011, I spoke with Senior Investigator Shelley Neiman with the Nevada Attorney General's office (NV-AG). Neiman said the NV-AG, as part of a mortgage fraud task force, had searched the office of American Escrow on October 27, 2009. Neiman said the NV-AG had seized large quantities of data during the search, including emails from computers.  Some of these emails were from sharon@successbullionusa.com.  After obtaining approval from the prosecuting attorney at the NV-AG, Neiman said she would forward emails seized from their search to the FBI.

### Email messages provided by the Nevada Attorney General

31.  Neiman provided me with a collection of email messages on January 26, 2011.  According to Neiman, these emails were seized from the computers at American Escrow in Henderson, Nevada.  The messages were from Gina Thomas at American Escrow.

32.  In one of the emails, dated August 26, 2009, from Lars Harrison to Marty Eerhart, Anthony Vanaki, Gina Thomas, and her assistant Ivy Fine, Harrison wrote:

> Anthony,
> Please find Karen Buchanan's signed agreements.  She is ready to wire the 200k into escrow tomorrow.  I will try to reach Gina Thomas or Ivy to get an escrow account number for her, or if Gina/Ivy would email me back with the number tomorrow morning.
> Kindest regards,
> Lars

17

US-013417

**_ATTACHMENT D_**

770-274-9417

Following this email, there were multiple emails replying to it
from Thomas, Vanaki, and Harrison.  After Thomas informed them
that two wires, each for $100,000, had been deposited into Karen
Buchanan's escrow account, Vanaki responded to Thomas on August
27, 2009:

> Break down for Karen
> Success - 115k
> PBS company - 85k [Vanaki's company]
> Thankx [sic]
> Anthony Vanaki

As explained below in paragraph 45, PBS (Prestigious Business
Solutions) is a company associated with Vanaki.

33.  Neiman provided me with multiple emails between Vanaki
and Thomas.  Vanaki appeared to use the email address
avanaki@mypbsolutions.com in all of his correspondence with
Thomas.  In the emails provided by Neiman, Vanaki often asked
Thomas whether his clients had deposited their funds into
American Escrow.  Once Thomas informed him that his clients had
made their deposits, Vanaki provided instructions to Thomas to
disburse the funds.  Vanaki also sometimes emailed apparently
fictitious account statements to Thomas.  Thomas would then email
the account statements, which were issued by Success Bullion, to
the clients.

34.  In one of the emails provided by Neiman, Vanaki
identified Sharon Ringgenberg as the designated recipient of the

US-013418

## ATTACHMENT D

funds owed to Success Bullion.  On June 9, 2009, Vanaki exchanged numerous emails with Thomas regarding a deal involving a client known as the CK Corporation.  Vanaki forwarded a Success Bullion FOREX account statement for the CK Corporation to Thomas.  The account statement showed CK Corporation having an account with a balance of $2,499,878.34.  In response to a request from Thomas for wiring instructions for the monies deposited by CK Corporation into American Escrow, Vanaki answered:

> Sharon Ringgenburg [sic] – 3805813775 account number, routing number 314970664.  Guaranty bank in walnut creek CA – 18k
> I need you to hold my 7k for a couple days until I get some things taken care of.
> 25k will go to Marty, I believe he is supplying the wire info.
> Anthony Vanaki

35.  Neiman also provided me with an email chain indicating Sharon Ringgenberg initially was on guard about hiding her identity, and she wanted to use the escrow agency as a buffer between herself and the victims.  The original email in the chain, dated June 9, 2009, contained a false account statement issued by Success Bullion for CK Corporation.  The name of the sender of the original email, following the "FROM," was missing.  Vanaki's name was listed on the "TO" line.  The composer of the forwarded email wrote:

> Make sure the money is ready to go before you send this to the escrow officer.  DO NOT send this directly to the client.  Let the escrow officer stay in the middle and facilitate this.

19

US-013419

## **_ATTACHMENT D_**

VP of Operations

Vanaki forwarded this email to the escrow agent Thomas.  In his
message forwarding the original email, he stated:

> From sharron [sic] lets complete this transaction ☺
>
> Anthony Vanaki

36.  Neiman provided me with more recent emails in which
Ringgenberg seemed to grow more comfortable in dealing directly
with American Escrow.  For instance, on July 15, 2009, an email
from sharon@successbullionusa.com to Thomas stated:

> Hello Gina,
> Attached is the statement for Camelot Capital, LLC.
> Thanks,
> Sharon Ringgenberg
> VP of Operations

Attached to the email was a Success Bullion FOREX account
statement for Camelot Capital, LLC.  The account statement
falsely showed this entity having an account with a balance of
$109,999,144.40.

37.  Many of the emails provided to me by Neiman indicated
Ringgenberg received a substantial share of the clients' funds
from deals brokered by Vanaki.  For instance, on June 25, 2009,
Vanaki sent another email to Thomas with a fake account statement
attached.  The Success Bullion FOREX account statement for Empire
Business Trust/QBM Consultants LLC showed their account having a
balance of $502,991,398.59.  Vanaki also used the email to

US-013420

**_ATTACHMENT D_**

instruct Thomas to disburse the client's funds.   In the email,

Vanaki wrote:

> Gina,
>
> Success Bullion – $140,000
> PBS Company – $60,000
> If you can please call me in the morning that would be
> great.   I land in SF at 8:30am.   Thank you.
> Also, Success Bullion and PBS will be splitting the
> $1000 dollar Escrow fee 50%.   Thank you.
> Anthony Vanaki
> Prestigious Business Solutions

Information Provided by Richard Hanes

38.   On July 15, 2010, Richard Hanes of Florida made a

complaint to his local FBI office concerning a potential loan

fraud.   Hanes alleged that his development company, Sanctuary

Manor, had joined with another Florida developer in attempting to

get financing for their projects.   Hanes said the developers had

been defrauded in the amount of $705,000, for which they had

received a bogus $50 million financial instrument described as a

stand by letter of credit.   The developers' funds had been wired

to the escrow agency Commercial Escrow Services in early 2010.

The financial instrument was issued by Success Bullion.   Hanes

identified Sharon Ringgenberg as the point of contact at Success

Bullion.   He identified Craig Scott as the broker who had tried

to arrange the deal.

Information Provided by Craig Scott

21

US-013421

## ATTACHMENT D

39.   I interviewed Craig Scott on October 6, 2010.   Scott said he did business as Scott Investment Group (SIG), which he operated out of his homes in Concord, California.   He explained SIG helped clients obtain unconventional financial products such as stand by letters of credit and proofs of funds.   Darryl Morris had been Scott's partner in SIG.   Scott said Morris had a background as a hedge fund manager, while Scott had a realtor license.   While Morris was no longer his partner, Scott said he still collaborated with him on a case-by-case basis.

40.   Scott said he had recently tried to facilitate a financing deal for a group of developers, including Sanctuary Manor and Washington Loop.   They wanted to use a stand by letter of credit as a vehicle to obtain financing for their projects. Scott explained this financial instrument would act as a form of collateral for a lender, who would provide the financing to the clients.   Scott, acting on their behalf, arranged for the purchase of a stand by letter of credit.   He said the deal fell through after the proposed lender rejected the terms of the stand by letter of credit.   Scott believed the fault for the rejection lay with the lender, who apparently changed his desired terms after the stand by letter of credit had been issued.   Scott said he did not profit from the failed deal, since SIG received its fee only after a loan funded.

US-013422

*ATTACHMENT D*

41.  Scott identified the issuer of the stand by letter of credit as Success Bullion.  He noted Success Bullion was a subsidiary of a publicly traded multinational corporation located in Hong Kong.  While Success Bullion was not a bank, it regularly created financial products.  Scott said he had other clients who had successfully used standby letters of credit issued by Success Bullion.  In my investigation to date, I have been unable to find an investor who successfully used a financial instrument created by Success Bullion.

42.  Subsequent to my interview of Scott, Jon Cohen contacted me.  He said he was an attorney and had been retained by Scott.

Information from the Internet and Physical Observation

43.  On October 15, 2010 and October 27, 2010, I reviewed the website for Success Bullion at www.successbullionusa.com.  I noted that, in the "About Us" tab, Success Bullion asserted its parent company was Success Universe Group Limited (SUGLHK), whose shares were traded on the Hong Kong stock market.  In the "Contact Us" tab on the Success Bullion website, it listed office addresses in San Francisco (580 California Street, Suite 1200) and Hong Kong (168 Connaught Road Central, Rooms 903-5, 1102, 2301-3, Shun Tak Centre).  The website also contained a link that connected to the website for SUGLHK.  I noticed that the SUGLHK

23

US-013423

website did not contain a link going back to the Success Bullion website.

44.   On October 29, 2010, I visited the office space of Success Bullion at 580 California Street, Suite 1200, San Francisco, California.   In the ground floor lobby of the 580 California Street, I noticed a large number of business names listed in Suite 1200.   I then went to the 12th floor and spoke with the receptionist for the floor.   She informed me that Suite 1200 is used as a virtual office.   The receptionist said mail received at Suite 1200 would be forwarded to other addresses used by the virtual tenants.   She said the virtual tenants could rent a conference room on the 12th floor.   I did not see any signs for Success Bullion on the 12th floor.

45.   On January 26, 2011, I reviewed the website for Anthony Vanaki's company, Prestigious Business Solutions, at mypbsolutions.com.   The website mypbsolutions.com advertised investment opportunities in unconventional financial instruments such as proofs of funds.   Since the time I reviewed it, the website has stopped functioning.

Information Provided by Lovina Lehr

46.   I interviewed Lovina Lehr on October 29, 2010.   Lehr identified herself as the managing partner of Washington Loop LLC, which she described as a real estate development firm in Florida.   Lehr said Washington Loop and other developers

24

US-013424

attempted to collectively obtain financing for their projects.
Their initial effort failed, but in the process she became
acquainted with Toni Hardstone, who owned Commercial Escrow
Services, an escrow agency located in Pleasant Hill, California.
Hardstone recommended Lehr seek the assistance of Craig Scott and
his partner Darryl Morris.

47. Lehr contacted Scott. According to Lehr, Scott said he
could obtain a valid stand by letter of credit from Success
Bullion, which he described as a subsidiary of a multinational
corporation in Hong Kong. An employee of Washington Loop did
some due diligence regarding Success Bullion, including examining
its website. The fact that Success Bullion's website linked to
the website of the multinational corporation in Hong Kong helped
convince Lehr that it was legitimate. Lehr authorized Hardstone
to release her group's funds once Success Bullion had issued a
valid stand by letter of credit. Lehr believed Hardstone wired
the clients' funds out of escrow around the end of March 2010.

48. Lehr informed me the financing deal for Washington Loop
and the other clients fell apart. When they attempted to use the
stand by letter of credit as collateral, the potential lender
informed them that it was invalid. Lehr and others attempted to
contact Scott and Sharon Ringgenberg, who Scott identified as his
point of contact at Success Bullion. Ringgenberg acted surprised
and confused about the problem with the stand by letter of

25

US-013425

credit. She denied the fault lay with her company. When Lehr
and other Washington Loop employees continued to contact
Ringgenberg, they were warned off by a lawyer with Success
Bullion, who told them to direct their communications to Scott.
Scott was non-responsive, calling back after normal business
hours and denying responsibility for any problems.

49. Lehr told me she persisted in attempting to contact
Scott, and they finally spoke on the phone. Scott said he could
do nothing to salvage the original deal. Instead, Scott proposed
to forge a second stand by letter of credit with airtight terms
to satisfy a different lender. The second stand by letter of
credit would also be issued by Success Bullion. Scott said
Washington Loop would need to pay an additional $480,000 to
obtain the second stand by letter of credit. Lehr told Scott she
wanted to meet Ringgenberg in the Success Bullion office at 580
California Street in San Francisco to discuss his offer. Scott
demurred and said Ringgenberg would only meet her outside of the
office. Lehr concluded this sounded suspicious and declined
Scott's offer.

Email messages provided by Lovina Lehr

50. On October 7, 2010, I received a forwarded chain of
emails from Lehr. The original email, dated May 6, 2010, was
from patrick@successbullionusa.com. It was addressed to Paul
Collins, who later in the email chain identified himself as a

26

US-013426

**_ATTACHMENT D_**

representative of Washington Loop, with courtesy copies sent to a number of others including Scott (craigscott84@gmail.com), Ringgenberg (sharon@successbullionusa.com), and Lehr in Florida. The email stated:

> Mr. Collins,
> As per our agreement with Scott Investments, and further, the contractual agreement between Scott Investments and their client; specifically as it pertains to communication (paragraph 9 and 12.1), please direct all correspondence to Scott Investments only as we wish to operate according to such agreement.
> Thank you,
> Patrick Harris
> Legal Affairs
> Hong Kong

Information Provided by the Hong Kong Police

51. On November 1, 2010, I requested FBI Agents in Hong Kong contact the local police to request they conduct an interview. Specifically, I requested law enforcement authorities contact responsible employees at SUGLHK and determine what connection it has to Success Bullion.

52. On January 18, 2011, an FBI Agent in Hong Kong reported that the Hong Kong Police had conducted an interview of staff in the legal office of SUGLHK. I was provided the following statement from the Hong Kong Police:

> Please be informed that the legal department of Success Universe Group Limited ('SUGLHK') in Hong Kong confirmed that the Success Bullion US ('SBUSA') is not a subsidiary of SUGLHK.
>
> There is no employee named Patrick Harris working in the legal department of SUGLHK.

27

US-013427

## ATTACHMENT D

The purported Hong Kong office of SBUSA at Room 903-5, 1102, 2302-3 Shun Tak Centre, West Tower, 168 Connaught Road, Central Hong Kong is the former office of a subsidiary of SUGLHK, namely Success Bullion (H.K.) Limited ('SBHKL'). SBHKL has moved out from the above mentioned address since August 2009.

SUGLHK also confirmed that www.successbullionusa.com is not a website of SUGLHK and its subsidiaries." (End of pertinent text).

Information Provided by the NFA

53. On December 1, 2010, I obtained records from the NFA, which identifies itself on its website as the national regulatory organization for the futures industry. Membership in the NFA is mandatory for anyone seeking to be a futures trader in the United States, including FOREX traders. The offices of the NFA are located in Chicago, Illinois.

54. The NFA has licensed Chris Jann to be a futures trader generally, and a FOREX trader specifically. The NFA approved him to act as the principal for Success Bullion. According to the NFA, Jann passed his Series 3 and Series 30 securities tests in 2006.

55. According to records provided by the NFA, Jann also obtained the NFA license for Success Bullion. Success Bullion is licensed to engage in FOREX trading and to serve as a commodity trading advisor. Success Bullion obtained full membership in the NFA on December 23, 2009.

28

US-013428

56.   On June 7, 2011, I interviewed NFA Field Supervisor
Jeffrey Glick.  Glick informed me that he conducted an audit of
the operations of Success Bullion and Jann.  Glick met Jann in a
rented conference room at 580 California Street, Suite 1200, in
San Francisco on February 10, 2010.  Jann told Glick that these
was the official location of Success Bullion, but Jann said he
actually conducted the company's business in his home.

57.   Jann told Glick that the original name of Success
Bullion was Raigold.  Jann said Raigold never had any clients.
Jann changed the name from Raigold to Success Bullion on June 29,
2009, after he became affiliated with SUGLHK.  He decided to
affiliate with SUGLHK because the Hong Kong company said it
wanted a presence in the United States, and it would refer
Chinese clients residing in America to Jann.

58.   Glick informed me that, when he conducted the audit of
Success Bullion, Jann told him that Success Bullion did not have
its own bank account yet.  He said he paid for the company's
expenses out of his personal bank accounts.  Jann said Success
Bullion did not have any clients as of February 2010.

Email messages provided by the NFA

59.   The NFA provided me its employees' email correspondence
with Jann.  These emails show Jann working with the NFA staff to
obtain licensing for Success Bullion, and to win approval for

29

US-013429

## ATTACHMENT D

revisions in the website successbullionusa.com.  Jann used the email address jannchris@gmail.com in his communications.

60.  During his audit of Success Bullion, NFA Field Supervisor Glick asked Jann to provide evidence that Success Bullion was a subsidiary of SUGLHK.  Later on the same day, Jann sent an email to Glick at jglick@nfa.futures.org, stating:

> Hi Jeff,
> thanks for coming to my office today, I really
> appreciate your help
> attached are the documents you asked for
> 1) the Success Bullion HK, the letter of authority, as
> its agency in San Francisco
>
> thanks a lot for help
> Best Regards'
> Chris Jann

Attached to the email from Jann were several scanned documents, including a falsified Letter of Authority from SUGLHK empowering Chris Jann to provide commodities and FOREX investment consultancy services on behalf of SUGLHK.

61.  On the same day, Glick replied to Jann's email.  Glick wrote he had reviewed Jann's bank account records and noticed Jann had received checks from Ringgenberg, who was using a bank account in the name of "SBUSA".  Glick requested copies of the checks.  He also asked Jann to explain his relationship with Ringgenberg and the nature of her company, since he was concerned that she might be an unlicensed principal of Success Bullion. Jann answered Glick on February 10, sending an email stating:

30

US-013430

> Hi Jeff,
> attached are the copies of the checks from Sharon
> Sharon is my friend, she loans me some money to pay the
> office rent, and some expenses.
> she is not an investor, not a shareholder either,
> All the checks belong to her company, and her DBA
> business, there is no relationship between our
> companies.
> basically, she is helping me to launch my company with
> some financial aid
> and I hope in the future, we can do some business
> together, as alliance
> if you have any questions, plese [sic] let me know
> many thanks
> Best Regards'
> Chris Jann

Attached to the email from Jann were several scanned checks from

bank accounts for SBUSA and Double R Horse Ranch LLC.

Ringgenberg and her daughter have exclusive signature authority

over the accounts.

62.   Glick responded on February 11, 2010 with follow-up

questions related to Jann's relationship with Ringgenberg.  Glick

asked Jann to describe Ringgenberg's business and explain why it

was using the name SBUSA.  Jann replied to Glick's email on the

same day, stating:

> Hi Jeff,
> since I don't have any bank accounts, Sharon is helping
> me, under her company, with DBA name: SBUSA
> but it belongs to her company, not mine,
> and I do hope we can make a business partner together as
> alliance in the future
> so I think this is could help me to start my business,
> as a financial support for me
> thanks
> Best Regards'
> Chris Jann

US-013431

**_ATTACHMENT D_**

Information Provided by Aaron Barrett

63.   The earliest known activity in the scheme was in
December 2008, when Success Bullion was still known as Raigold.
On June 7, 2011, I interviewed Aaron Barrett.  Barrett said in
2008 he was a co-worker of loan officer David Chen of Atlanta,
Georgia.  Barrett said Chen was part of a scheme designed to
obtain loans from banks through fraudulent means.  Barrett said
part of Chen's scheme was to provide the banks with fictitious
statements showing the borrowers owning assets that did not
exist.  Barrett looked through Chen's files and decided to
provide incriminating documents to the FBI.  On December 18,
2008, Barrett provided several documents to Special Agent Mason
Gant with the Atlanta office of the FBI.

64.   One of the documents provided by Barrett to the FBI was
a letter from Chris Jann.  Jann wrote he was the Account Manger
(sic) at Raigold.  Raigold's office addresses were listed as 580
California Street, Suite 1200, San Francisco, California 94104,
and 99 Queen's Road Central, Hong Kong.  Jann wrote that two
entities, which Barrett said were clients of Chen, have a balance
of $1,117,663 in Raigold's accounts.

Information Provided by Heather Hargett

65.   On November 9, 2010, I interviewed Heather Hargett.
Hargett was a partner in the development company Glen Playa LLC
of Key Largo, Florida.  On behalf of the company, Hargett was

32

US-013432

attempting to find financing for a horse farm when she approached
Scott.  Scott originally proposed obtaining a $100,000,000 stand
by letter of credit from Success Bullion to use as collateral.
The cost to Glen Playa would be $550,000.  Hargett decided this
fee was too high, and they negotiated a deal in which Glen Playa
would pay $25,000 for a smaller stand by letter of credit of
$10,000,000, with more fees to be paid later.  Scott said he
would arrange for a financier in Dubai to make a loan to Glen
Playa using the stand by letter of credit as collateral.

66.  Hargett told me she was concerned about the legitimacy
of Scott's operation.  To put her at ease, Scott said the Stand
by letter of credit would be issued by Success Bullion, which he
said was a subsidiary of a huge Hong Kong-based conglomerate.
Scott also produced documentation from Success Bullion showing he
was an authorized dealer of the company's stand by letters of
credit.  Hargett performed her own due diligence.  She explored
Success Bullion's website, and she verified its claim to be a
member of the National Futures Association (NFA).  Finally,
Hargett telephoned Success Bullion and spoke with Sharon
Ringgenberg, who identified herself as an officer of the company.
Ringgenberg confirmed her company could provide a Stand by letter
of credit for Glen Playa.  Ringgenberg also confirmed Scott was
an authorized dealer in Success Bullion's stand by letters of
credit.

33

US-013433

67.   Hargett told me Hargett's partner wired $25,000 directly to Scott's bank account on June 22, 2010.  A few days later, Scott informed her that Success Bullion issued a Stand by letter of credit.  Despite Scott's promise that financing would become available within 20 days, nothing materialized.  Scott became evasive.  Hargett telephoned Ringgenberg to complain. According to Hargett, Ringgenberg acted surprised.  Ringgenberg said she had worked with Scott over a year, and she claimed this was the first complaint she had heard about him.  Based on my interview of Lovina Lehr, I knew this to be untrue.  (See paragraph 49 above.)  Scott subsequently telephoned Hargett and informed her that he was canceling the deal and forfeiting Glen Playa's $25,000 deposit because Hargett should not have contacted Ringgenberg directly.  Hargett subsequently created the website www.craigscott-scam.com to warn other potential clients of Scott. She also filed a complaint about Success Bullion with the NFA.

Email messages provided by Heather Hargett

68.   On November 10, 2010, Hargett provided me with her email correspondence with Scott, who used the email address craigscott84@gmail.com.  Hargett told me she was typically in Florida or other states in southeastern United States when she received these emails.  Scott used an email to provide Hargett with information about his business associates.  In an email dated May 25, 2010, Scott wrote to Hargett:

34

US-013434

**_ATTACHMENT D_**

> Hey Heather,
> Here is what I came up with.  Based on the amount you
> would need (cash in hand at the end of closing) to fund
> at least one of your proposed projects.  I believe a
> $100M SBLC would get your [sic] the net result your [sic]
> looking for . . .
> The initial cost will be $550k . . . .
> I have attached some information about us, our provider,
> and the escrow company we use . . .
> [imbedded in the email were links to
> www.successbullionusa.com and www.commercialescrow.com]
> If you would like more information, or to see a DRAFT
> copy of the SBLC or contract just let me know and I will
> be happy to send those to you.
> Thanks again,

Attached to the email were two documents.  One document,

apparently copied from text on www.successbullionusa.com,

described Success Bullion and its relationship to a Hong Kong

corporation.  The second document was a letter dated April 7,

2010, stating:

> To whom it may concern,
> This letter is to confirm that Scott Investment Group,
> comprising of the principals Craig Scott and Darryl
> Morris, are fund managers that are authorized to
> initiate Standby Letters of Credit from SBUSA subject to
> certain terms and conditions.
> [signed]
> Sharon Ringgenberg
> VP of Operations

69.   In another email to Hargett, again sent from

craigscott84@gmail.com, Scott provided her with details of the

fictitious Stand by letter of credit purchased by Glen Playa from

Success Bullion.  On July 1, 2010, Scott wrote:

> Here you go
> SBLC No. - SB100203

35

US-013435

Amount:  $23,000,000USD
Phone:  (415) 283-3266 [phone number of Success Bullion]
Craig Scott
Scott Investment Group, Inc.
(925) 383-7011

70.  After weeks had passed with no word from the lender in
Dubai that Scott had supposedly identified, Hargett said she
began to badger Scott.  On August 27, 2010, Scott replied using
craigscott84@gmail.com.  Scott wrote:

> Heather,
> I received your email and contacted the trust in Dubai
> to get an update from them, since I assumed they would
> be talking to you directly at this point.  It is
> Ramadon, [sic] a Muslim holiday that go's [sic] into
> early/mid Sept. and you should not expect anything until
> after the holiday is over.
> With that said, if I get one more of your cute email,
> text, or any other message from you, other than to say
> "thank you", I will cancel this transaction and come
> after you for the outstanding fees that are due . . . .

Information Provided by Bank Records

71.  I reviewed records from Bank of America pertaining to
Craig Scott and others.  Although Scott had informed me in our
interview that he did not profit from the failed deal involving
Washington Loop and Sanctuary Manor, the bank records did not
support his statement.  Included in the documents were the
records of several wires from Commercial Escrow Services (CES) to
Craig Scott.  One of the wires, dated March 26, 2010, was in the
amount of $267,425.  The wire record included the escrow
reference number 39-5260.  On August 6, 2010, Richard Hanes from

36

US-013436

Sanctuary Manor had provided me with a copy of CES' contract with Washington Loop and Sanctuary Manor.  The contract showed CES had assigned the same escrow number, 39-5260, to their deal.

72.  I reviewed records from Union Bank of California pertaining to CES and others.  From these records, I discovered other parties that benefitted from the disbursement of monies deposited by the Florida developers, including Washington Loop. On March 26, 2010, as noted above, CES wired $267,425 to Craig Scott's account in Bank of America.  On the same day, also in the amount of $267,425, CES wired funds to "Quantum International Trading."  An email provided to me on September 14, 2010, by Jesko Onken, an attorney representing Washington Loop, showed that Quantum International Trading was a name used by Scott's business associate Darryl Morris.  The bank records also showed that on March 26, 2010, CES wired $165,000 to the account of "SBUSA" in US Bank.

73.  I reviewed records from US Bank and Compass Bank (formerly Guaranty Bank) pertaining to Success Bullion and Sharon Ringgenberg.  I analyzed these records and determined that, between April 2009 and December 2010, Ringgenberg received wires and electronic deposits to her accounts in excess of $3.2 million.  Most of these funds came from three sources:  the escrow companies CES and American Escrow, and Anthony Vanaki's Prestigious Business Solutions.

37

US-013437

## *ATTACHMENT D*

74.   According to US Bank and Compass Bank records, Ringgenberg transferred a substantial portion of the funds from business accounts in the name of Success Bullion into personal bank accounts with which she shared control with her daughter Breann Kvernes.   Together, they used the funds to pay for living, travel, and entertainment expenses.   They also used the proceeds to purchase real property in California and Ohio, and they purchased at least two vehicles.   I could not trace the investors' funds to any expenses I would expect to see with a FOREX company, nor did I see expenses related to the legitimate issuance of financial instruments such as stand by letters of credit.

75.   I reviewed Bank of America records for Chris Jann.   I also reviewed Ringgenberg's accounts for payments to Jann.   The bank records showed occasional modest payments from Ringgenberg to Jann.   Between March 2009 and January 2010, Ringgenberg wrote at least nine checks to Chris Jann, totaling over $13,000.   Beginning in March 2010, Jann made several deposits of cash into Bank of America account, totaling over $7000.   The deposits were made at the Bank of America branch in Martinez, California, where Ringgenberg resides.

Information Provided by Internet Service Providers

76.   I reviewed records from GoDaddy.com.   The records provided by GoDaddy.com showed it hosted the website for Success

US-013438

## ATTACHMENT D

Bullion and email accounts for sharon@successbullionusa.com and patrick@successbullionusa.com.   According to the records, the earliest use of these email addresses was on May 27, 2009.

77.   On April 25, 2011, I received an email from Nancy McNelis, a paralegal at 1&1 Internet Inc.  She confirmed that her company is hosting the domain and the associated emails for mypbsolutions.com.  She also informed me the account is currently suspended because of a billing issue, and the email accounts have not been active since March 2011, but 1&1 Internet has not purged the email accounts.

78.   According to the Internet website www.centralops.net, Vanaki's website mypbsolutions.com was created on August 13, 2008.

Information Regarding the Duration of the Scheme

79.   I have requested the authority to seize emails from targeted accounts from December 1, 2008 to present.  The earliest known activity in the scheme occurred no later than December 2008 when Jann created a letter falsely stating that several entities had over $1 million in accounts with Raigold, which Jann later stated was the same entity as Success Bullion.  While the scheme did not seem to fully hit its stride until approximately April of 2009, in my experience sophisticated frauds typically develop in phases or iterations.  During those early phases, participants in frauds often develop the ground rules for their conspiracies and

39

US-013439

test the utility of fraudulent documents, such as Jann's Raigold letter from December 2008.

I.   Conclusion

80.   Based upon the information above, I believe there is probable cause that the email accounts sharon@successbullionusa.com, patrick@successbullionusa.com, avanki@mypbsolutions.com, jannchris@gmail.com, and craigscott84@gmail.com are currently being used in violation of Title 18, United States Code, Section 1343 (Wire Fraud).  As such, I have probable cause to believe that on the computer systems owned, maintained, and/or operated by Google, GoDaddy.com, and 1&1 Internet Inc., there exists evidence and instrumentalities of violations of Title, 18 United States Code, Sections 1343.  By this affidavit and application, I respectfully request that the Court issue search warrants directed to Google, GoDaddy.com, and 1&1 Internet Inc., allowing agents to seize the email and other information stored on their servers for the applicable accounts and following the search procedure described in Attachments A1-A3.

/ / /

/ / /

/ / /

/ / /

/ / /

US-013440

**_ATTACHMENT D_**

J.    Request for Sealing

    81.   Since this investigation is continuing, disclosure of the search warrant, this affidavit and the application would jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of the applications for search warrant and the application for search warrant be filed under seal until further order of this Court.

Steven C. Coffin
Special Agent
Federal Bureau of Investigation
Concord, California


Subscribed and sworn to before me this 21ST day of June, 2011.

THE HONORABLE DONNA M. RYU
UNITED STATES MAGISTRATE JUDGE

41

US-013441